## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CRISIS CENTER NORTH, INC.,** | **Case No.:** |
| **Plaintiff,** | |
| **vs.** | **JURY TRIAL DEMANDED** |
| **PENNSYLVANIA COALITION AGAINST DOMESTIC VIOLENCE, and PENNSYLVANIA DEPARTENT OF HUMAN SERVICES,** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Crisis Center North, Inc. ("CCN" or the "Center"), by and through its undersigned counsel, files this Complaint against Defendants, the Pennsylvania Coalition Against Domestic Violence ("PCADV" or the "Coalition") and the Pennsylvania Department of Human Services ("DHS" or the "Department") and, in support thereof, avers as follows:

### Summary of the Action

1.    CCN has been the primary provider of services to victims of domestic violence in northern and western Allegheny County, Pennsylvania for over 40 years.

2.    PCADV serves two purposes: first, as a membership organization for providers of domestic violence services, and second, as a pass-through for federal

and state grant funding for domestic violence services pursuant to a contract with DHS.

3.     Since 1983, CCN has been both a member of PCADV and a recipient of grant funds which PCADV distributes to domestic violence providers on behalf of DHS.

4.     In recent years, PCADV has made a series of demands and issued a series of threats to CCN at significant cost to CCN and with no plausible justification, or with justifications which proved to be false or mistaken when investigated.

5.     At no point has PCADV identified any programmatic or governance problems as CCN. It's demands, instead, have been limited only to onerous paperwork requirements which it repeatedly failed to justify and which it does not apply evenly to recipients of its grants.

6.     CCN has made significant efforts over time to find common ground with PCADV, but PCADV has repeatedly failed to work with CCN to find a reasonable compromise.

7.     Instead, the chief executive officer of PCADV sent a letter stating "that PCADV will not renew its Grant Agreement with Crisis Center North, Inc.," giving, as its justification, CCN's failure to spend five figures per year on producing a very specific but unnecessary form of financial reporting, as well as

2

4917-1120-4771 v1

unexplained complaints about PCADV's review of employee timecards that seem to come down to a demand to review records related to funding streams unrelated to PCADV. PCADV has not been able to convincingly explain the need for either of these. After its various justifications fell apart, PCADV simply refused to discuss its demands further.

8.      CCN attempted to contact DHS, at this point, in an effort to resolve this issue, as PCADV acts as an agent for DHS in its role as a grantmaking entity.

9.      DHS refused to help.

10.     CCN was forced, at this point, to conclude that PCADV was acting in a manner intended to retaliate against CCN for protected speech that PCADV perceived as slights against either PCADV or its chief executive officer, and that DHS was unwilling to rein in its agent.

11.     As a result, CCN now reluctantly brings this action, as it has become obvious that PCADV and DHS have no intention of treating CCN fairly or in good faith, either as contractual partners of CCN or as state actors.

## Parties

12.     Plaintiff Crisis Center North is a Pennsylvania Nonprofit Corporation with an office address of 5000 McKnight Road, Pittsburgh, Pennsylvania.

3

4917-1120-4771 v1

13. Defendant Pennsylvania Coalition Against Domestic Violence is a Pennsylvania Nonprofit Corporation with an office address of 3501 North Front Street, Suite 220, Harrisburg PA.

14. Defendant Pennsylvania Department of Human Services is a department of the Commonwealth of Pennsylvania with its primary office at 625 Forster Street, Harrisburg, Pennsylvania.

## Jurisdiction and Venue

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises out of Defendants' violation of 42 U.S.C. § 1983 and infringement of CCN's rights under the United States Constitution, including the First, Fifth, and Fourteenth Amendments.

16. The Court also has subject matter jurisdiction over this action pursuant to Section 1331 because this action relates to Defendants' management of Federal funds distributed pursuant to 42 U.S.C. § 1397 *et seq.* and 42 U.S.C. § 10401, *et seq.*.

17. This Court has subject matter jurisdiction over CCN's state-law claims pursuant to 28 U.S.C. § 1367, because those claims arise from the same conduct giving rise to CCN's federal claims.

4

4917-1120-4771 v1

18.     This Court has personal jurisdiction over both Defendants, both of which are located in this District and either incorporated under the laws of the Commonwealth of Pennsylvania or a part of the Commonwealth of Pennsylvania.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to Plaintiff's claims occurred in this District.

20.     Additionally, PCADV consented to jurisdiction and venue in the Middle District of Pennsylvania in relevant Grant Agreement, attached hereto as Exhibit A (PCADV-CCN 2024-2026 Grant Agreement), ¶ 10.

## Factual Background

### *PCADV's Role in Distributing Domestic Violence Grants*

21.     Funding for assistance to the victims of domestic violence is varied, and includes, *inter alia*, private donations, grants from foundations, payments through local governments, and insurance payments.

22.     The largest source of funding for domestic violence service providers, however, is federal and state grants, which are distributed using a variety of methods and by a variety of federal and state agencies as well as private nonprofits like PCADV which receive Master Grants and then act as agents of the government in giving out subsequent Sub-Grants.

4917-1120-4771 v1

23.    The Master Grants are awarded through Master Grant Agreements between the government entities and the nonprofits which act as their agents.

24.    Among those and relevant here is the Master Grant Agreement between PCADV and DHS which is attached hereto as Exhibit B.

25.    PCADV then enters into additional Grant Agreements with sub-grantees like the agreement between PCADV and CCN. *See* Exhibit A.

26.    It is by this method that a large percentage of the funding available for services for victims of domestic violence is distributed in Pennsylvania.

27.    Federal Social Services Block Grant funds awarded under Title XX of the Social Security Act, for example, are awarded by this method. *See* 42 U.S.C. § 1397 *et seq*.; Exhibit A, Rider 3.

28.    Federal Family Violence Prevention and Services Act funds are also awarded by this method. *See* 42 U.S.C. § 10401, *et seq*.; Exhibit A, Rider 3.

29.    Various Pennsylvania state grants are also awarded by this method. Exhibit A, Rider 3.

30.    CCN has long been a recipient of sub-grants under each of these programs.

31.    When awarding these funds, PCADV also requires a kickback to itself from all grant recipients, in the amount of 2% of the amount of any grant award, under the monicker "administrative cost." Exhibit A, ¶ 8.

4917-1120-4771 v1

32.    This payment is a condition of receipt of an award and "must be paid from funding other than the program's PCADV allocation." Exhibit A, ¶ 8.

33.    In other words, CCN was required to make a "pay to play" cash payment of nearly $6,000 each year in order to receive funding allocated by the United States Congress and the Pennsylvania General Assembly.

34.    These "pay to play" payments are made only after PCADV retains up to ten percent of the full Master Grant amount as "administrative cost" under the Master Agreement. Exhibit B, ¶ 12.

35.    PCADV can further collect reimbursement of up to 5% of the full Master Grant amount for "training and technical assistance provided to subgrantees." Exhibit B, ¶ 12.

36.    The result is that up to 16.8% of the funds allocated by the Federal and state government may go to PCADV, rather than domestic violence service providers.

37.    Of the expected three-year allocation from DHS of $84,708,659.75 in the Master Agreement (the actual eventual amount is higher), that could amount to up to $14,231,054.84 of funds intended to help survivors of domestic violence retained or clawed back by PCADV, or an average of $4,743,684.95 per program year.

7

38.    On its website, PCADV has not posted any financial information relating to any time after the 2021-2022 fiscal year. Financials, https://www.pcadv.org/about-pcadv/financials/ (last visited 4/17/2026); Exhibit C (2022 PCADV Independent Auditor's Report).

39.    In the Master Grant Agreement, similarly, one of the few redactions in the publicly available document is Section III-4 of the Technical Submittal in PCADV's Application for the grant, a section titled "Financial Capability." Exhibit B.

40.    As a result of PCADV's lack of financial transparency, CCN is unable to say what portion of the Master Grant funds PCADV retained or clawed back at any time during the term of the current Master Agreement.

41.    PCADV provides no services to survivors of domestic violence.

42.    PCADV also allocates funds from other sources, including distributing funds from a grant from the Richard King Mellon Foundation. CCN has traditionally been one of the recipients of these funds.

43.    In its role as a grant-making body, PCADV also has some oversight role, and monitors its grantees for compliance with the terms of underlying grants, programming effectiveness, and fiscal administration. To this end, it has produced a lengthy document it refers to as "program standards." Exhibit A, Rider 5.

44.    These standards were created by PCADV.

45.     PCADV requires that all grantees agree to Grant Agreements without negotiation and, in Pennsylvania, has a monopoly on the award of the Federal and State grant funds under its control. As a result, providers of domestic violence services are forced to agree in order to effectively operate.

46.     Because the provisions of the Grant Agreement are not negotiable and PCADV holds a superior bargaining position and can, and does, engage in significant economic compulsion, the provisions are unconscionable and unenforceable.

47.     In recent years, PCADV funding has amounted to about twenty percent of CCN's budget. For the 2025-2026 fiscal year, this amounted to $322,407.00. *See* Grant Addendum attached hereto as Exhibit D.

### *PCADV's Role as a Membership Coalition*

48.     PCADV is not only a grant-making body but also acts as a membership organization for providers of domestic violence services.

49.     CCN has been a coalition member of PCADV for over forty years.

50.     PCADV and its coalition members enter into Membership Agreements. A copy of PCADV's Membership Agreement with CCN is attached hereto as Exhibit E.

9

4917-1120-4771 v1

51. Ironically, the Membership Agreement states, "[a]t PCADV, we embrace diversity and its collective strength in creating a community where systems support ALL so everyone can thrive." Exhibit E, p. 1.

52. The Membership Agreement provides that members "agree not to engage in solicitation or lobbying efforts earmarked for domestic violence services to the Pennsylvania Department of Human Services (DHS) for the benefit of their program or county only." Exhibit E, p. 3.

53. Membership in the coalition is governed by a Membership Committee, made up of representatives of selected member organizations.

### *PCADV Begins to Adopt an Adversarial Attitude To CCN When a New CEO is Hired, Who Later Openly Stated Her Intention to Act Arbitrarily*

54. For many years, PCADV monitoring of CCN was uncontroversial and collaborative.

55. PCADV has never claimed that CCN's award-winning programming was not up to PCADV standards. To the contrary, that programming has always been universally regarded as excellent and is consistently award-winning.

56. Awards won by CCN for its high-quality and innovative programing, staff, or volunteers include the Purple Ribbon Admin of the Year Award in 2026; the Purple Ribbon Outstanding Pet Program Award in 2025, the Purple Ribbon Lifetime Achievement Award in 2024; the Purple Ribbon Volunteer of the Year Award in 2024; the National Crime Victims Research Award in 2022; the

4917-1120-4771 v1

American Humane Hero Dog Award in 2022; the Governor's Victim Service Pathfinder Award in 2017, 2019 and 2021; and the Gender & Sexual Justice Caucus and Women of Color Caucus Diversity Award in 2017.

57.     CCN's fiscal controls and fiscal management, similarly, have always been exemplary. CCN has received clean audit reports from its outside auditors for the entirety of its existence, which are the best possible reports an auditor can issue.

58.     CCN has also carefully maintained healthy financial reserves in order to weather difficult times that are more robust than most organizations in the domestic violence services field, including, on information and belief, PCADV.

59.     During Pennsylvania's 2025 budget standoff, for example, CCN was able to operate at full capacity with no staff layoff or service interruptions on reserves and provide services to its community throughout.

60.     PCADV, on information and belief, instead was forced to borrow at interest to continue operating due to its failure to plan for such contingencies.

61.     For most of the history of CCN's membership and grant-recipient relationship with PCADV, PCADV recognized CCN's excellent fiscal management, a reflected in its long history of clean audits.

62.     This ended, however, after PCADV hired its current CEO, Susan Higginbotham.

4917-1120-4771 v1

63. In 2022, PCADV made a determination that CCN's finances were "moderately at risk."

64. This claim, however, was based on a mathematical error by PCADV on its scoresheet, which CCN promptly pointed out. In fact, CCN's finances were as solid as they had been for years.

65. The error was inherent to the scoresheet and, if applied to all programs, would result in incorrect scores for all programs rated by PCADV.

66. PCADV, however, refused to acknowledge its error and stood by its erroneous judgment. Higginbotham stated, "I can give you whatever score I want."

67. CCN staff were shocked by this open statement of intention to act in an arbitrary and capricious manner in the distribution of Federal and state grant funds.

68. Eventually, CCN was forced to appeal to DHS to correct this clear error.

69. Because PCADV will not share contact information of DHS staff with its members or grantees, CCN called the office of the Pennsylvania Governor to find the number to call in order to correct the error PCADV refused to correct.

70. Eventually CCN reached DHS, and, on information and belief, DHS intervened in this instance to correct this clear error, at least as to CCN.

12

71.    At a subsequent meeting, Higginbotham stated, "someone in this organization called the Governor's office," and also stated that she was aware someone had contacted DHS, becoming visibly angry, and falsely telling multiple persons associated with CCN that they were not permitted to speak to DHS staff or the Governor's office.

72.    After this point, PCADV instituted a new practice that grantees were not permitted to review their scorecards, and as a result CCN is unable to say whether this error was corrected in a systematic way.

73.    Higginbotham also later, after a perceived slight by the Governor's office (she asked to speak at an event but was instead just recognized by another speaker), expressed her suspicion that CCN's CEO was responsible for the perceived slight, apparently because CCN had called the Governor's office to find a telephone number.

74.    PCADV's campaign of progressively increasing and increasingly costly reporting demands of CCN significantly increased after this event.

***PCADV Embarks on a Course of Ever-Increasing and Unexplained Demands of CCN in Tri-Annual Monitorings***

75.    PCADV conducted a monitoring of CCN in 2016, a year before Higginbotham became CEO of PCADV.

13

4917-1120-4771 v1

76. In 2016, CCN's internal fiscal controls were not significantly different than they would be in subsequent years, with the exception of changes made in efforts to comply with PCADV's demands.

77. The 2016 monitoring resulted in only one example of identified non-compliance with PCADV standards. Monitoring report attached hereto as Exhibit F.

78. This was related to data collection and required CCN review service definitions with staff and institute a process for review of statistics for reporting. Exhibit F, p. 1.

79. Less than two months after the monitoring, CCN was able to comply with these requests. Exhibit F, p. 2. PCADV agreed that CCN was in compliance with PCADV standards.

80. When CCN was next monitored in 2019, the demands expanded. Monitoring report attached hereto as Exhibit G.

81. PCADV, for the first time, demanded that CCN report its financials to its board in a specific format, produced "directly out of QuickBooks" and "show[ing] budgeted versus actuals." Exhibit G, p. 2.

82. There were also three other issues raised, all to be addressed by staff training or additional written procedures. Exhibit G, pp. 2-3.

4917-1120-4771 v1

83. In response, CCN reported the staff training and additional procedures it instituted and explained, for the first time, why its robust reporting to its board was sufficient and the specific and unexplained requirements PCADV sought to impose were unnecessary. Exhibit G, pp. 4-5.

84. Indeed, as noted in CCN's response, "the information provided… accurately portrays the financial situation of the organizations and is more valuable than simply providing budget vs. actual information directly out of QuickBooks." Exhibit G, p. 5.

85. PCADV's response reflected its understanding that complying with its demands "would require a redesign of the chart of accounts," and "would interfere in the reports that are currently reviewed by the board for at least one year, specifically the income statement, current month versus same month in the prior year, and the year-to-date income statement versus the same period in the prior year." Exhibit G, p. 6.

86. The response further stated, "PCADV feels it would be a disadvantage to Crisis Center North's management and the Board of Directors for us to require a redesign of the chart of accounts," and "[t]herefore, PCADV accepts your response provided on this issue and considers it resolved." Exhibit G, p. 6.

87. PCADV would later change its position on this.

88.    CCN was next monitored in 2022. Monitoring report with CCN responses attached as Exhibit H.

89.    Despite the extensive prior explanation of CCN's fiscal reporting procedures and the reasons for them, the 2022 monitoring returned to similar points, again demanding not that CCN's finances be structured not to be effective or informative to its board, but in an arbitrary format adding significant expense for no stated reason. Exhibit H, pp. 1-9.

90.    Despite PCADV's acknowledgement in 2019, this included a "budget versus actual comparison by funding stream" produced directly from QuickBooks. Exhibit H, pp. 2-3. This requirement was especially onerous, as certain budget items by funding stream amounted to miniscule amounts of money, but CCN staff or fiscal consultants would be forced to spend significant time on each, many of which, if there were divergences through the year, would amount to one or two figure amounts.

91.    CCN again provided extensive explanation of the reasons for its processes and why those procedures were sufficient, as well as the significant additional cost and labor that would be required to abandon its processes in favor of those preferred by PCADV. Exhibit H, pp. 1-9.

16

92.     PCADV has never to date provided a convincing explanation for why CCN's procedures were insufficient, or why, if they were insufficient, all other auditors and monitors found them exemplary.

93.     The requirement that documents be provided to CCN's board as pdfs and produced "directly out of QuickBooks" is especially puzzling. The only explanation offered for it was that CCN staff could alter the reports produced to the board if fiscal information was provided in some other way.

94.     This is, of course, insulting, when there has never been any indication of fiscal malfeasance at CCN, and to the contrary, decades of audits tell the opposite story.

95.     But beyond that, if this were the purpose, it would be pointless. PDFs can be altered as easily as the spreadsheets CCN used for the specific budget v. actual and funding stream-specific reporting that PCADV demanded be run through QuickBooks.

96.     What's more, if some malfeasance was occurring, alterations could be made in QuickBooks in the first instance. Indeed, if some bad actor were engaged in malfeasance, having multiple repositories of information would *increase* the likelihood it would be discovered quickly.

97.    The only significant effect of PCADV's demand was an increase in cost and work for CCN. Given the lack of plausible justification, it appears that this was, in fact, the purpose.

98.    Importantly, in addition to being without plausible justification, this requirement was not a part of PCADV's own program standards. Exhibit A, Rider 5.

99.    In the 2022 monitoring, PCADV also, for the first time, raised what would become a series of confusing demands regarding staff timecards. Exhibit F, p. 11-12. CCN complied with PCADV's required action on this point – or at least believed that it had. Exhibit H, p. 11-12.

100.    CCN had previously established a confirmed timesheet structure with PCADV staff in the course of the 2019 monitoring, and following the 2022 monitoring, PCADV again confirmed that the timesheets were compliant after CCN's efforts to comply with PCADV's new 2022 demands.

101.    Following the 2022 monitoring, PCADV placed CCN on "provisional" status, which interfered with its ability to fundraise from other funders, while also holding back its own funding until it decided that the "provisional" status would be removed.

102.    PCADV had no clear processes for "provisional" status. Among the things PCADV did not have, or at least would not share with CCN, were a formula

18

for determining who would be placed on "provisional" status, a policy determining how long "provisional" status could last, or a qualitative metric for what would be required to be removed from "provisional" status.

103.   To the contrary, PCADV staff used provisional status as an excuse to arbitrarily withhold funds for long periods of time, only to be restored when and if PCADV staff felt like it, with PCADV keeping any interest income in the meantime.

104.   CCN worked diligently to comply with PCADV's demands nonetheless, and on August 1, 2024, the "provisional" status was terminated by PCADV, subject to a handful of additional requirements which CCN promptly competed.

105.   PCADV paid the grant funds it had held back during the "provisional" status period but did not turn over to CCN the interest accrued on those funds while it was withholding them.

106.   To the degree CCN believed that it had sufficiently complied with PCADV's demands on these issues, that belief was not to last.

107.   PCADV returned to CCN for another monitoring in 2025. Monitoring report attached hereto as Exhibit I.

19

108.   This was the first monitoring after PCADV's 2022 attempt to impose an erroneous "moderately at risk" rating on CCN based on a mathematical error and CCN was forced to go to DHS for help when PCADV refused to correct it.

109.   Despite PCADV's previous recognition of the difficulty of producing information in the precise format it demanded, of the sufficiency of the financial reporting CCN had in place, and of the burden of changing it, the 2025 monitoring report again demanded that CCN "[p]rovide the [CCN] Board of Directors with a minimum of a Balance Sheet and Revenue and Expense statement produced directly from the accounting software (in pdf) to include fund performance (budget to actual) for each funding stream." Exhibit I, p. 1.

110.   The 2025 report also stated that "PCADV funding is lumped together as one fund, although their accounting system is set-up to perform fund/project accounting by funding stream." Exhibit I, p. 1.

111.   Of course, PCADV had by this point known for six years that this was not true in at least two ways.

112.   First, the information PCADV referred to was being preserved and presented to the CCN's board – and PCADV. PCADV's complaint was not that the information was not kept or properly shared, but only that CCN did not arbitrarily use a much more expensive method that added no value.

20

113. Second, PCADV knew that QuickBooks was *not* set up to perform in this way, which was the reason complying with PCADV's demands would be so expensive and difficult.

114. This demand was also not supported by the standard PCADV listed as the reason for it.

115. The pdf format requirement, for example, did not appear in the standard. Neither, more importantly, did the "fund performance (budget to actual) for each funding stream." Exhibit I, p. 1; Exhibit A, Rider 5, § 3.2.2. This was an arbitrary demand in excess of PCADV's already lengthy standards.

116. To the contrary, the standards require that "[f]inancial statements shall be reviewed by management on a monthly basis and variances between budgeted and actuals shall be analyzed. Any material variances (greater than 10%) shall be documented." Exhibit A, Rider 5, § 3.2.2.

117. CCN did all of these things, as PCADV knew, but not in the specific and costly way PCADV demanded.

118. The 2025 report did not give any justification for this demand. Exhibit I.

119. Oddly, given the importance that PCADV was to place on this demand at this point and later, it was not required by PCADV for removal from the "provisional" status PCADV subjected CCN to in 2022.

120. The 2025 report also included a demand that checks written by CCN but not cashed by their recipients be "resolved." Exhibit I, pp. 1-2. Again, this arbitrary demand was not supported by the standard quoted by PCADV.

121. Instead, PCADV gave this language for the standard: "Bank Statements shall be reviewed and analyzed for any anomalies such as missing checks as part of the monthly back reconciliation process." Exhibit I, p. 1, Exhibit A, Rider 5, § 3.2.5 (actually reads, "Bank statements shall be received by the person reconciling the account after they have been reviewed and analyzed for any anomalies such as missing checks or checks with missing signatures.").

122. But PCADV did not and could not claim that the monthly bank reconciliation process was not being carried out, or that any checks were missing. Instead, it was demanding that CCN either track down people who had properly received checks from CCN but not cashed them and force them to cash the checks or cancel those checks.

123. In the specific case of an uncashed check PCADV identified, CCN had chosen not to cancel the check because it was a payment for housing for a victim of domestic violence, and CCN was unwilling to risk compromising that person's housing by possibly causing the rent check to bounce when eventually deposited by the landlord.

124. This was yet another arbitrary demand with no plausible oversight purpose, unsupported by PCADV's own standards, that seemed to do nothing but create more work and expense for CCN.

125. The 2025 report also included as an "action item" an additional long and confusing demand for staff timecards, referring back to the 2022 monitoring report. Exhibit I, p. 2. PCADV did not, however, regard this as significant enough to identify as a "deficiency" or "non-compliance issue."

126. In verbal discussions, it became clear to CCN staff that what PCADV was in fact demanding was information relating to other funders, which it was not entitled to.

### *PCADV's Other Efforts to Harm CCN*

127. Meanwhile, in 2024, PCADV and Higginbotham pursued an effort to remove CCN from PCADV membership.

128. In 2024, the then-chair of CCN's board attended a public legislative meeting and asked a question about Pennsylvania's funding allocation process, that affected, among others, CCN.

129. Higginbotham or someone acting on her behalf attempted to use this act of public participation in government to induce the PCADV membership committee to remove CCN from membership.

4917-1120-4771 v1

130. This was despite the clear fact that this was not even plausibly a breach of the membership agreement, which only requires that member organizations not "engage in solicitation or lobbying efforts earmarked for domestic violence services to the Pennsylvania Department of Human Services (DHS) for the benefit of their program or county only." Exhibit D, p. 3.

131. First, the General Assembly, much less the small subset of it which was in attendance at the meeting, is not DHS.

132. Second, asking a question is not "solicitation or lobbying."

133. Third, funding for particular types of programs would not benefit CCN or Allegheny County only.

134. Fourth, a single member of CCN's board, even the chair, is not CCN.

135. Nonetheless, Higginbotham clearly saw an opportunity to attack CCN and took it, falsely telling a CCN board member that board members could not ever speak to legislators without Higginbotham present.

136. On information and belief, Higginbotham did not make this false claim to other PCADV members.

137. The board chair and a few other representatives of CCN met with the Membership Committee in November of 2024 and explained what had occurred. The Membership Committee, which is made up of representatives of several domestic violence centers that are PCADV members but are not controlled by

24

PCADV staff. The chair of the Membership Committee spoke to CCN's board regarding membership requirements, but the Committee did not accede to Higginbotham's request that CCN's membership be revoked.

138. This rebuke did not, however, deter Higginbotham in her efforts to retaliate against CCN.

139. In 2025, after a meeting with a state representative whose district includes areas served by CCN in which that representative asked about the formula by which domestic violence funding was allocated, Higginbotham told a subordinate that she intended to retaliate against CCN, apparently assuming that CCN was responsible for Higginbotham being asked questions she did not wish to answer.

### PCADV Embarks on a Course of Threats and Retaliation

140. On November 18, 2025, Higginbotham sent a letter to CCN. Attached hereto as Exhibit J.

141. That letter purported to "notify you of a material breach in performance, as well as to ask CCN to provide a corrective action plan that immediately cures the issues described below within 10 business days." Exhibit J.

142. The November 18 letter did not describe any issues. It simply generally stated "for three successive fiscal monitoring's [*sic.*], CCN has not been

25

in full compliance with PCADV standards." No description was given of what supposed non-compliance constituted this claimed material breach. Exhibit J.

143.    Further, the November 18 letter ignored that PCADV did not have a contractual right to demand a corrective action plan. To the contrary, the Grant Agreement instead requires that *PCADV*, if it believes there is a material breach of the Grant Agreement, provide "written notice… specifying the deficiency(ies) and a proposed corrective action plan… The identification of performance deficiencies and the elements of the corrective action plan shall be determined by PCADV." Exhibit A, Rider 4, § 30.

144.    Nonetheless, PCADV stated that "unless CCN communicates a corrective action plan that meets the requirements of the standards to PCADV's satisfaction, CCN's contract will be cancelled as of December 3, 2025." Exhibit J.

145.    By failing to specifically identify what PCADV regarded to be a material breach or what form such a corrective action plan might take, PCADV not only violated the contract that it had drafted, but also made it practically impossible to comply with its demands. Subsequent events would prove that this was intentional.

146.    Higginbotham then sent her threat to incorrect email addresses, but it eventually reached CCN.

4917-1120-4771 v1

147. On December 17, 2025, CCN responded to Higginbotham's threat with a letter and a monitoring response addressing each claimed issue in the monitoring report. Attached hereto as Exhibits K (letter) and L (monitoring response).

148. These outlined PCADV's divergence from its own standards as well as the difficulties and absurdities of PCADV's demands, but nonetheless provided action plans as demanded. Exhibits K, L.

149. CCN also agreed to produce the "fund performance (budget to actual) for each funding stream," which PCADV demanded despite its own standards not requiring it, on the condition that PCADV pay the costs of compliance, estimated to be $18,000. Exhibit K, p. 3.

150. Additionally, CCN gave notice of a grant controversy relating to not only PCADV's demands but also its anticipatory breach of the contract, which by the terms of the Grant Agreement PCADV must respond to within 120 days. Exhibit K, p. 1; Exhibit A, Rider 4, § 31.

151. The 120 days expired on April 17, 2026, and PCADV did not respond.

152. CCN's December 17 communications began a series of efforts by PCADV to justify its demands, which successively fell apart one-by-one.

4917-1120-4771 v1

153.   On January 7, 2026, PCADV sent a letter claiming, among other things, that its demands were required by DHS, either in the Master Agreement or some other communications. Attached hereto as Exhibit M, *see* p. 2.

154.   In response, CCN, in a telephone conversation between counsel, requested that PCADV provide the Master Agreement and these communications.

155.   PCADV never did provide those or any support for its claims that DHS required the actions PCADV demanded, but CCN was able to acquire a copy of the Master Agreement from the Commonwealth of Pennsylvania, nonetheless. It contains no such requirements. Exhibit B.

156.   Instead, it requires only audits, which CCN has engaged in and passed with flying colors for decades. Exhibit B, Rider 5.

157.   In a letter dated February 24, 2026, PCADV changed its tune, and instead claimed that its demands were required by "Uniform Guidance." Attached hereto as Exhibit N. On information and belief, when PCADV refers to "Uniform Guidance" it means Part 200 of the Code of Federal Regulations. 2 C.F.R. Part 200.

158.   The Uniform Guidance, however, also does not require the panoply of arbitrary demands made by PCADV. To the contrary, it too requires audits. 2 C.F.R. § 200.501 *et seq.*

4917-1120-4771 v1

159.   CCN underwent outside audits, including for the 2024-2025 fiscal year, which confirmed CCN's compliance with the Uniform Guidance. 2024-2025 Audited Financial Statement attached hereto as Exhibit O.

160.   Audits required under Part 200 must be performed to the standards of Generally Accepted Government Auditing Standards (GAGAS), not the arbitrary whims of PCADV. 2 C.F.R. § 200.514.

161.   Indeed, PCADV's own financial statements, to the degree it has released them, are audited based on the Uniform Guidance and GAGAS, not the arbitrary demands it imposed on CCN. Exhibit C, pp. 24, 32.

162.   PCADV has to date refused to identify what section or provision of the Uniform Guidance it believes justifies its demands.

163.   The February 24 letter also claimed that the demand for specific budget vs. actual reports produced directly from QuickBooks demanded by PCADV is "easy to accomplish" and "a best practice." Exhibit N, p. 3.

164.   The first statement was knowingly false. PCADV has known and acknowledged since 2019 that compliance with this demand would not only be difficult and expensive, but in PCADV's own words, "a disadvantage to Crisis Center North's management and Board of Directors." Exhibit G, p. 6.

165.   The second statement appears to be as baseless as the claims that PCADV's demands were required by either DHS or the Code of Federal

Regulations. PCADV has categorically refused to identify what set of "best practices" this demand is supposedly drawn from.

166. The January 7 letter also stated that "all 59 programs receiving funding from PCADV comply with the standard terms and conditions of their sub-grant agreements," and "CCN has refused to be held accountable on the same standards as all other Sub-Grantees of PCADV." Exhibit M, pp. 2, 3.

167. In its February 24 letter, PCADV returned to this same point, stating that "PCADV cannot negotiate different standards of accountability with different member programs." Exhibit N, p. 1.

168. In the course of its coalition work, CCN had occasion to review the financial reporting of a number of other PCADV grantees.

169. As would be expected of a variety of different organizations with different needs and resources, these reports varied significantly in content and format.

170. What they all had in common, however, was that *none* complied with PCADV's demands of CCN. In short, PCADV's claim that CCN, alone among its 59 sub-grantees, was unable to comply with these demands was another falsehood.

171. Although it was PCADV's responsibility to provide CCN with a corrective action plan, rather than the other way around (Exhibit A, Rider 4, § 30), PCADV's January 7th letter recognized that CCN had provided a corrective action

30

plan on December 17 – "If [CCN wishes] to provide any additional Corrective Action Plan (beyond Mr. Barnhart's December 17, 2025 Memorandum), PCADV will be pleased to consider it." Exhibit M, p. 4. PCADV soon changed direction on this also.

172.    In a February 13, 2026, letter, PCADV misrepresented and directly contradicted its prior statement, saying, "CCN has still failed to submit a Corrective Action Plan (see my letter of January 7, 2026) as required by PCADV's Notice of Material Breach in Performance that not only makes it compliant now but also ensures ongoing compliance with PCADV's identified standards." Attached hereto as Exhibit P, p. 2.

173.    PCADV's February 24 letter again misrepresented not only its own but also CCN's statements, saying, "Your prior correspondence did not provide a Corrective Action Plan but instead objected to the need for one." Exhibit N, p. 2. This misstatement was especially egregious as it immediately followed an extensive quotation from the Grant Agreement that stated that it was *PCADV's* responsibility, not CCN's, to draft and propose a corrective action plan, if one was to be used. Exhibit N, p. 2; Exhibit A, Rider 4, § 30.

174.    The purpose of this is transparent. PCADV did not want a corrective action plan, or it would have drafted one as the contract it wrote requires, accepted

31

the corrective action plan provided by CCN, or provided some guidance regarding what it form it believed such a plan should take.

175. Instead, PCADV demanded a document that it ensured could never be produced to its satisfaction in order to create a pretext to retaliate against CCN.

176. The demand for a corrective action plan which was in fact PCADV's responsibility to provide, and which in any case CCN had already provided was not the only instance of PCADV engaging in bad faith demands for documents it had already received.

177. CCN's December 17 letter also served as a notice of a grant "controversy" under Rider 4, Section 31 of the Grant Agreement, while also noting that section is unconscionable and unenforceable. Exhibit K, p. 1.

178. Section 31 requires only that grantees "must, within six months after the cause of action accrues, file a written claim with the PCADV for a determination. The claim shall state all grounds upon which the Grantee asserts a controversy exists." Exhibit A, Rider 4, § 31.

179. The cause of action accrued on November 18, 2025, when PCADV committed an anticipatory breach of the Grant Agreement by threatening to "cancel" CCN's contract. Exhibit J. The December 17 letter, less than one month later, stated the grounds of the controversy. Exhibit K.

180. Nonetheless, PCADV on January 7 claimed that "CCN must file a written claim with PCADV stating all grounds upon which it is asserted a controversy exists." Exhibit M, p. 4.

181. As CCN had already filed its written claim stating the grounds of the controversy, this was another bad-faith statement by PCADV and an effort to cast CCN's actions as in some unknown way insufficient, without explaining what PCADV would find sufficient.

182. This has been PCADV's consistent tactic: state in a conclusory manner that CCN has failed to comply with its demands, made contrary to the language of the Grant Agreement PCADV wrote, and then refuse to explain why. In each case, this was never an effort to induce compliance with PCADV's demands, it was instead an effort to make compliance impossible to set up PCADV's ultimate retaliation against CCN.

183. This is in keeping with PCADV's actions in and following its monitorings. As CCN struggled to comply with its demands, PCADV devised ever more burdensome and arbitrary demands, increasingly detached from its own written standards, including reporting requirements it could not justify and did not demand of other sub-grantees, and turnover of employee timesheets containing information to which it was not entitled.

4917-1120-4771 v1

184. The only plausible purpose of this was to create further pretexts to act to retaliate against CCN, and the only plausible reason for PCADV and its CEO to retaliate against CCN was because of the protected speech of CCN or persons associated with CCN.

185. On March 20, 2026, PCADV decided that its pretext was sufficiently secure and sent CCN a letter titled "PCADV's Notice of Non-Renewal of Grant Agreement with Crisis Center North, Inc." Attached hereto as Exhibit Q.

186. This letter repeated the line PCADV had taken throughout its efforts to manufacture its pretext, stating that "QuickBooks software is set up to perform fund/project accounting by funding stream" despite its long knowledge that this was false and of the burden it was proposing to place on CCN; implying (but no longer stating) that its actions were required by DHS; implying (but not quite saying) that its demands with regard to timesheets were required by Uniform Guidance; and again falsely stating that CCN failed to provide a corrective action plan, although it had and it was PCADV's responsibility to do so if it believed one was warranted. Exhibit Q.

187. Presumably having recognized how clear the breach of the contract it drafted would be if it simply cut off funding as it had previously threatened (see Exhibit J), PCADV instead claimed it was "providing notice at this time that CCN's grant will not be renewed." Exhibit Q.

4917-1120-4771 v1

188.   The current grant period ends on June 30, 2026, and grantees apply for renewal at that time. Applications for grants for the 2026-2028 period had not been submitted at that time and still have not.

189.   The March 20 letter advances no theory to justify PCADV's claimed authority to preemptively deny a grant before applications have even been received, and certainly not on a pretextual basis.

190.   PCADV subsequently represented to CCN that this decision was approved by PCADV's Board of Directors.

### PCADV's Refusal to Award Funds Under a Private Grant Was an Additional Instance of Retaliation

191.   PCADV's preemptive denial of future grant awards is the most significant aspect of PCADV's retaliation against CCN in terms of effect on CCN's ability to provide services to victims of domestic violence. It is not, however, the only one.

192.   Even before PCADV felt confident enough in its pretext to purport to bar CCN from renewing its Grant Agreement, it had already acted to harm CCN by excluding it from a private grant which CCN had traditionally received funds.

193.   In its January 7 letter, PCADV stated, "Lastly, CCN should be aware that PCADV has not issued a contract to CCN for Richard King Mellon Foundation funds. While CCN is not specifically named in that grant, PCADV has allocated funds to CCN from that source in the past. PCADV does not intend to do

that unless and until CCN comes into compliance with the fiscal standards in this letter." Exhibit L, p. 4.

194.    In other words, PCADV admitted that it specifically denied this funding to CCN because CCN was unable to comply with its arbitrary and unsupported demands.

195.    The Richard King Mellon Foundation Grant traditionally provided CCN in the range of $67,750 per year.

## DHS Refuses Not Only to Act to Rein In Its Agent, but Even To Do A Bare Investigation

196.    PCADV has made efforts to keep its sub-grantees from interacting with DHS. On information and belief, the purpose of this policy is to ensure that PCADV controls the information available to DHS.

197.    Despite this, CCN was able to identify a contact in DHS working in the area of domestic violence, Executive Policy Specialist Louie Marven.

198.    CCN contacted Mr. Marven by email on March 24, 2026 to seek assistance following PCADV's purported notice of non-renewal and in the hope that DHS might act to put a stop to PCADV's retaliatory and unlawful actions. Attached hereto at Exhibit R.

199.    CCN also made a phone call to Mr. Marven which was not answered.

200.    For nearly three weeks, neither Mr. Marven nor anyone else at DHS responded.

4917-1120-4771 v1

201.   Finally, on April 13, 2026, DHS Executive Policy Director Danielle Duckett replied to the email. Attached hereto as Exhibit S.

202.   The email from Duckett reads: "Under the terms of the agreement, PCADV is responsible for subgrantee network management, including selection of subgrantees and the development of subgrants. The grant is a public record, and I have attached a copy here for your reference. If you have specific questions regarding subgrantee selection or disqualification, PCADV would be best positioned to provide additional detail." Exhibit S.

203.   DHS, through Duckett, made very clear through this communication that it was refusing to exercise any oversight over its agent's wrongful and unlawful behavior.

**The Result of PCADV and DHS' Actions is Both Monetary and Irreparable Harm to CCN**

204.   In the 2025-2026 fiscal year, CCN was allocated $322,407.00 in Federal and state grant funding through PCADV.

205.   Assuming the level of funding remains flat, PCADV's refusal to renew the Grant Agreement for retaliatory and pretextual reasons will cost CCN more than $640,000 over just the next contract period.

206.   This is in addition to the $63,750  in Richard King Mellon Foundation grant funds PCADV separately, but still wrongfully, cut off, and amounts to about 20% of CCN's annual budget.

37

4917-1120-4771 v1

207. PCADV's actions have consequences for CCN beyond these bare numbers, however.

208. A refusal to renew a grant on fiscal grounds, even demonstrably false ones, has a reputational effect with other funders, and is likely to harm all other fundraising.

209. Survivors of domestic violence within the area served by CCN similarly will be harmed by the reduced services CCN will be able to offer.

210. Indeed, survivors outside that area will also suffer, as service providers sometimes work in complimentary ways. For example, CCN has the capacity to handle more intense and longer-term cases than other shelters. Women's Center and Shelter in Pittsburgh often sends CCN cases that it is unable to handle, including cases involving the hoteling of domestic violence survivors when its shelter is full or when survivors also need housing for companion animals.

211. As a result of this, CCN will suffer reputational damage among both fellow service providers and clients.

212. Specific programs at CCN are wholly funded by grant funds distributed by PCADV and would be unable to continue without those funds.

213. For example, CCN's medical advocacy program is wholly funded through PCADV-distributed funding.

4917-1120-4771 v1

214. The medical advocacy program works to advocate for victims of domestic violence within medical systems.

215. Without PCADV-administered funds, CCN would be unable to provide this vital service to ensure that survivors of domestic violence are protected and served properly in the context of their medical treatment.

216. And, ultimately, a loss of more than 20% of CCN's funding is likely to make it impossible for CCN to continue providing services at all. This is the ultimate irreparable harm for CCN, but also for survivors of domestic violence in CCN's service area, who will no longer have a local option when in crisis.

## COUNT I
## VIOLATION OF DUE PROCESS - FEDERAL
## 42 U.S.C. § 1983, U.S. Const. Am. 1, 5, 14

217. CCN incorporates by reference all prior averments as if set forth at length herein.

218. PCADV's actions violated CCN's procedural and substantive due process rights.

219. PCADV is a state actor when acting in its grant-making capacity, as the agent of DHS and the Commonwealth of Pennsylvania as well as, ultimately, the United States.

220. DHS is a governmental agency.

4917-1120-4771 v1

221.  PCADV ignored or subverted its own requirements and procedures with regard to CCN, violating its procedural due process rights.

222.  Among the specific actions PCADV took in contravention of its established procedures are:

    a.  demanding that CCN comply with demands in excess of and/or in conflict with its own published standards;

    b.  threatening to "cancel" CCN's contract without procedural basis;

    c.  demanding that CCN take actions in response to PCADV's improper demands which were in fact PCADV's responsibility, including but not limited to producing a "corrective action plan," and subsequently purporting to punish CCN for failure to do so;

    d.  refusing to act on CCN's notice of grant controversy, instead in bad faith claiming that it was insufficient for unstated reasons which were, in any case, not supported by PCADV's procedures; and

    e.  purporting to "inform" CCN that its grant would not be renewed without basis in its own procedures.

223.  DHS violated CCN's procedural due process rights by failing to engage in any procedure to investigate or correct its agent's unlawful actions.

224.  PCADV violated CCN's substantive due process rights by acting to retaliate against CCN by, *inter alia*:

4917-1120-4771 v1

   a. making demands of CCN it knew CCN could not accomplish, including demands that were designed to be impossible to comply with, in order to create a pretext to retaliate;

   b. causing CCN to expend over $160,000 in efforts to comply with PCADV's arbitrary and unsupported demands;

   c. purporting to prevent CCN from applying for and/or receiving future grants on the basis of arbitrary, unexplained, and unsupported demands.

225. PCADV's actions were also aimed at retaliating against CCN for protected speech under the First Amendment to the United States Constitution, specifically for 1) speech to the Commonwealth of Pennsylvania including the Office of the Governor and DHS seeking the redress of grievances when PCADV wrongfully refused to correct a mathematical error by PCADV which was being used by PCADV to harm CCN; and 2) speech to one or more Pennsylvania State Legislators.

226. PCADV's CEO openly stated to her staff that her intention was to retaliate against CCN.

227. The context of this statement was a meeting with an elected official to whom PCADV's CEO believed CCN representatives had spoken about CCN's work.

4917-1120-4771 v1

228.   PCADV's actions were intended and if not addressed will have the effect of preventing CCN from fairly competing for federal and state assistance for reasons that are arbitrary, capricious, oppressive, pretextual, and/or retaliatory.

229.   PCADV's CEO openly stated her intention to act in an arbitrary manner in a meeting with CCN staff.

230.   DHS violated CCN's substantive due process rights by failing to control and thereby approving its agent's violations of CCN's substantive due process rights as set forth above.

231.   PCADV also denied CCN equal protection of the law by imposing demands upon it in order to fairly compete for federal and state funding that it did not place on other grantees, as evidenced by the fact that, of the PCADV grantees whose financial reports were reviewed by CCN, *none* of the reviewed reports would have been compliant with PCADV's demands to CCN.

232.   As a result of these actions, CCN suffered both monetary and irreparable harm.

## COUNT II
### VIOLATION OF PENNSYLVANIA CONSTITUTIONAL RIGHTS
### Pa. Const. Art. I §§ 1, 7, 20

233.   CCN incorporates by reference all prior averments as if set forth at length herein.

234. The Pennsylvania Constitution independently protects the due process, equal protection, and free expression rights of Pennsylvanians from infringement by persons or entities acting on behalf of the Commonwealth. Pa. Const. Art. I §§ 1, 7, 20.

235. Additionally, "every man for an injury done to him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Pa. Const. Art. I § 11.

236. Pennsylvania applies a rational basis test for government action that is much less permissive of government action than the rational basis test applicable to the Federal Constitution, as well as a strict scrutiny test for fundamental rights. *Nixon v. Dep't of Pub. Welfare*, 576 Pa. 385 (2003).

237. Substantive due process under the Pennsylvania Constitution also includes a right to reputation.

238. PCADV, acting on behalf of DHS and the Commonwealth and approved by DHS, used tactics that were arbitrary and retaliatory against CCN for the purpose of retaliating against CCN for protected speech, especially speech to the government. In doing so, PCADV violated CCN's Pennsylvania Constitutional rights under not only substantive due process but also both sections protecting free expression.

4917-1120-4771 v1

239.   PCADV also violated CCN's procedural due process rights by refusing to provide an impartial tribunal. Instead, PCADV acted arbitrarily, in bad faith, and dishonestly in demanding that CCN take actions that over time became increasingly difficult and increasingly disconnected from PCADV's standards and any plausible purpose; in repeatedly refusing to acknowledge that CCN had taken actions demanded by PCADV, whether PCADV had a right to demand them or not; and by setting vague implied requirements for compliance in order to ensure that CCN could not comply.

240.   In short, PCADV fixed the game in order to create a pretext for the action PCADV intended to take all along: retaliating against CCN by denying it federal and state funding. By doing this, PCADV violated both substantive and procedural due process at the same time.

241.   PCADV also, by fabricating a "fiscal" pretext for its retaliation, did harm to CCN's excellent and well-deserved reputation for fiscal strength and probity, in violation of the Pennsylvania Constitution's right to reputation.

242.   As a result of these actions, CCN has suffered both monetary and irreparable harm.

44

## COUNT III
## BREACH OF CONTRACT
### Grant Agreement

243.   CCN incorporates by reference all prior averments as if set forth at length herein.

244.   PCADV entered into a contract with CCN in the form of the Grant Agreement.

245.   This was a contract of adhesion and in many particulars, including especially the one-sided conflict resolution provisions, is unconscionable and not enforceable against CCN.

246.   This, however, does not meant that PCADV is free to ignore the provisions of the contract it used its monopoly power over certain state and federal grants to support survivors of domestic violence to force on CCN.

247.   The Grant Agreement provides that "This Grant is subject to audit in accordance with Audit Clause A attached hereto and incorporated herein by reference." Exhibit A, Rider 4, § 27.

248.   PCADV ignored those audits and instead demanded separate, costly, and unnecessary actions by CCN with no basis in Section 27 or Audit Clause A. These actions were not related to or required for an audit, but simply additional arbitrary demands by PCADV.

45

4917-1120-4771 v1

249.    Its demands were also not supported by the program standards PCADV insisted be included in the Grant Agreement.

250.    With regard to "controversies," the Grant Agreement provides that "PCADV shall review timely-filed claims and issue a final determination, in writing, regarding the claim. The final determination shall be issued within 120 days of the receipt of the claim, unless extended by consent of the PCADV and the Grantee." Exhibit A, Rider 4, § 31.

251.    CCN filed a claim when PCADV began threatening to cancel its contract based on its manufactured pretexts and its retaliatory motive, but PCADV did not review it or issue a final determination.

252.    Instead, CCN pretended in bad faith that CCN had not done so, or if it did its claim was in some unspecified way insufficient, or if it was sufficient, it was somehow barred by a six-month limitation, despite being delivered to PCADV less than a month after PCADV's threat. Exhibit M.

253.    These breaches of the Grant Agreement caused CCN both monetary and irreparable harm.

**COUNT IV**
**BREACH OF CONTRACT**
**Membership Agreement**

254.    CCN incorporates by reference all prior averments as if set forth at length herein.

4917-1120-4771 v1

255.   The Membership Agreement states; "It is the role of PCADV to work together with its Board of Directors to ensure that PCADV and its member programs have the resources needed to serve victims of domestic violence and to advance initiatives that promote the end of violence against women." Exhibit E.

256.   Instead of ensuring that CCN, a member organization, had the resources to serve victims of domestic violence and advance initiatives that promote the end of violence against women, PCADV manufactured a pretext to deny CCN those resources then acted to ensure that those resources were denied.

257.   PCADV represented that its Board of Directors assented to this action.

258.   This breach of the Membership Agreement caused CCN both monetary and irreparable harm.

## COUNT V
## BREACH OF CONTRACT - IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Grant Agreement and Membership Agreement

259.   CCN incorporates by reference all prior averments as if set forth at length herein.

260.   PCADV entered into both the Grant Agreement and the Membership Agreement, and in doing so, implicitly agreed to act honestly in the conduct or transaction concerned.

47

261.    PCADV, however, failed to do so, by making demands in excess of the contract terms as to both contracts, by manufacturing pretexts to make it appear that CCN had breached the contracts.

262.    In the case of the Grant Agreement, PCADV did so by demanding excessive fiscal reporting that did not comport with either necessity or the bounds of the contract; by demanding a corrective action plan that it, not CCN, was required to provide; and by claiming in bad faith that CCN had not provided a corrective action plan and had not properly made a claim under the conflict resolution portions of the contract and/or in bad faith demanding that the corrective action plan or claim were in some unspecified and extra-contractual way insufficient.

263.    In the case of the Membership Agreement, PCADV did so by attempting to induce the Membership Committee to revoke CCN's membership based on a bad faith and extra-contractual effort to chill CCN's and CCN's Board President's protected speech; and by acting to deny resources to CCN necessary to fulfill the purpose of the Membership Agreement by in bad faith, arbitrarily, and retaliatorily denying access to funding to complete CCN's mission to provide services to survivors of domestic violence.

48

4917-1120-4771 v1

264. These breaches of the Grant Agreement and Membership Agreement's implied covenants of good faith and fair dealing caused CCN both monetary and irreparable harm.

**WHEREFORE**, CCN seeks the following relief:

- Judgment in its favor, and against Defendants jointly and severally on Counts I-V;

- Actual and compensatory damages adequate to compensate CCN for Defendants' misconduct complained of herein, including, but not limited to, interest and costs, in an amount to be proven at trial;

- Punitive damages in an amount sufficient to punish Defendants and deter them and others from engaging in similar conduct;

- A preliminary injunction barring defendants from wrongfully denying CCN renewal of the Grant Agreement or of the right to apply for renewal; restoring other grant funding wrongfully withheld; and enjoining CCN from wrongfully withholding additional funding;

- A permanent injunction barring Defendants from wrongfully denying CCN renewal of the Grant Agreement or of the right to apply for renewal; restoring other grant funding wrongfully withheld; and enjoining CCN from wrongfully withholding additional funding; and

4917-1120-4771 v1

- Such other relief as the Court may deem just, proper, and equitable.

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

Date:  April 20, 2026

*/s/ Bruce C. Fox, Esquire*
Bruce C. Fox, Esquire
(Pa. Attorney I.D. No. 42576)
Christopher M. Kurek, Esquire
(Pa. I.D. No. 309038)
D. McArdle Booker, Esquire
(Pa. Attorney I.D. No. 320890)
525 William Penn Place, Suite 1710
Pittsburgh, PA  15219
(412) 566-1500 Telephone
(412) 281-1530 Facsimile
*Attorneys for Crisis Center North, Inc.*

# **CERTIFICATE OF SERVICE**

I, Bruce C. Fox, Esquire hereby certify that on the 20th day of April, 2026, a true and correct copy of the foregoing Complaint has been transmitted to the following persons by means indicated below:

Stephen G. Rhoads, Esq.
MacMain Leinhauser
433 W. Market Street,
Suite 200
West Chester, PA 19382
srhoads@macmainlaw.com
*Via email and certified mail*

*Counsel for Defendant*
*Pennsylvania Coalition*
*Against Domestic Violence*

Pennsylvania
Department of Human
Services
625 Forster Street
Harrisburg, PA 17120
*Via hand delivery and*
*certified mail*

Office of the
Attorney General
Civil Litigation Section
15th Floor,
Strawberry Square
Harrisburg, PA 17120
*Via hand delivery and*
*certified mail*

OBERMAYER REBMANN MAXWELL &
HIPPEL LLP

Date:  April 20, 2026

*/s/ Bruce C. Fox, Esquire*
Bruce C. Fox, Esquire
(Pa. Attorney I.D. No. 42576)
Christopher M. Kurek, Esquire
(Pa. I.D. No. 309038)
D. McArdle Booker, Esquire
(Pa. Attorney I.D. No. 320890)
525 William Penn Place, Suite 1710
Pittsburgh, PA  15219
(412) 566-1500 Telephone
(412) 281-1530 Facsimile
*Attorneys for Crisis Center North, Inc.*

51

4917-1120-4771 v1