# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRISIS CENTER NORTH, INC., | : | Civil No. 1:26-CV-01015 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA COALITION | : | |
| AGAINST DOMESTIC VIOLENCE and | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| HUMAN SERVICES, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This matter is before the court on Plaintiff Crisis Center North, Inc.'s ("CCN") application for entry of default against Defendant Pennsylvania Department of Human Services ("DHS"), Doc. 19, DHS's motion to dismiss for failure to state a claim, Doc. 23, and Defendant Pennsylvania Coalition Against Domestic Violence's ("the Coalition") motion to dismiss for failure to state a claim, Doc. 29.  For the reasons explained herein, the court will deny CCN's application for entry of default, Doc. 19, grant DHS's motion to dismiss for failure to state a claim, Doc. 23, and grant in part and deny in part the Coalition's motion to dismiss for failure to state a claim, Doc. 29.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

CCN is a Pennsylvania nonprofit corporation based in Pittsburgh, Pennsylvania.  (Doc. 1, ¶ 12.)  CCN is the primary service provider for domestic

1

violence victims in northern and western Allegheny County. (*Id.* ¶ 1.) It has been a member of the Coalition since 1983. (*Id.* ¶ 3.) The Coalition is also a Pennsylvania nonprofit corporation and is based in Harrisburg Pennsylvania. (*Id.* ¶ 13.) The court refers to the Coalition and DHS, collectively, as "Defendants."

The Coalition distributes grant funds to domestic violence service providers, including CCN, on behalf of DHS. (*Id.* ¶ 3.) DHS is a department of the Commonwealth of Pennsylvania based in Harrisburg. (*Id.* ¶ 14.) Domestic violence service providers get most of their funding from federal and state grants, which are distributed by nonprofits like the Coalition. (*Id.* ¶ 22.) The Coalition provides no direct services to survivors of domestic violence, and it distributes funds from sources other than the state and federal governments. (*Id.* ¶¶ 41–42.) Relevant here, it enters a master grant agreement, Doc. 1-3,[1] with DHS and then distributes the resultant grants to service providers like CCN, with whom it enters sub-grant agreements.[2] (*Id.* ¶¶ 22–24, 27–29 (offering several specific federal and state grant categories that are awarded through this process).) CCN alleges that the grant funding it received from the Coalition typically amounts to about twenty

---

[1] The court may consider exhibits attached to the complaint, matters of public record, and documents "*integral to to or explicitly relied* upon in the complaint . . ." when ruling on a motion to dismiss. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (first quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993); and then quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997)).

[2] The court refers to the Coalition's grant agreement with CCN, Doc. 1-2, as the "grant agreement."

percent of its budget, and in the 2025 to 2026 fiscal year, it received $322,407 through the Coalition.  (*Id.* ¶ 47.)

The Coalition retains an oversight role; it "monitors its grantees for compliance with the terms of underlying grants, programming effectiveness, and fiscal administration" according to "program standards" it sets.  (*Id.* ¶ 43–44.) Those standards require that all grant recipients agree to the Coalition's proposed grant agreements without negotiation, and because the Coalition "has a monopoly on the award of the Federal and State grant funds under its control . . . providers of domestic violence services are forced to agree in order to effectively operate."  (*Id.* at 45.)

In addition to distributing grant funds, the Coalition acts as a "membership organization" for providers of domestic violence services.  (*Id.* ¶ 48.)  To be a member, a service provider must enter a membership agreement, Doc. 1-6, with the Coalition.  (*Id.* ¶ 50.)[3]  A membership committee comprised of representatives of selected member organizations governs membership in the Coalition.  (*Id.* ¶ 53.) The Coalition's membership agreement requires that members "agree not to engage in solicitation or lobbying efforts earmarked for domestic violence services

---

[3] The court refers to this membership agreement, and specifically the membership agreement with respect to CCN, as the "membership agreement."

to the Pennsylvania Department of Human Services (DHS) for the benefit of their program or county only." (*Id.* ¶ 52.)

In the past, the Coalition's monitoring of CCN was "uncontroversial and collaborative"; before the controversy presented in this suit, the Coalition never found that CCN failed to meet its standards, and CCN has won several awards for its work over the last decade. (*Id.* ¶ 56.) CCN has also exercised responsible "fiscal controls and fiscal management," which have allowed it to "weather more difficult times" better than other organizations that provide domestic violence services, including the Coalition. (*Id.* ¶¶ 57–60.)

The Coalition recognized CCN's sound fiscal management throughout the history of the two parties' relationship, and CCN quickly fixed issues the Coalition discovered when it first "monitored" CCN in 2016. (*Id.* ¶¶ 61, 75–77.) But in subsequent Coalition monitors of CCN in 2019 and 2022, the Coalition began imposing demands on CCN including an expensive reporting requirement that CCN found to be arbitrary and confusing. (*Id.* ¶¶ 79–100.)[4]

---

[4] After the 2022 monitoring, the Coalition placed CCN on "provisional" status, which impacted CCN's ability to raise funds from other sources while also preventing CCN from receiving grant funds from the Coalition. (*Id.* ¶ 101.) CCN claims that the Coalition had no clear process for placing CCN on provisional status and used it only as "an excuse to arbitrarily withhold funds for long periods of time, only to be restored when and if [the Coalition] staff felt like it, with [the Coalition] keeping any interest income in the meantime." (*Id.* ¶¶ 102–103.) Although the Coalition removed the provisional status in 2024 after CCN complied with additional demands, the Coalition did not give CCN the interest accrued on the funds it withheld. (*Id.* ¶¶ 104–105.)

In 2022, the Coalition labelled CCN's finances "moderately at risk." (*Id.* ¶ 63.) CCN claims this was error. (*Id.* ¶¶ 64–65.) But when CCN raised the issue with the Coalition, the Coalition stood by the "moderately at risk" label, and Coalition CEO Susan Higginbotham ("Higginbotham") said to CCN: "I can give you whatever score I want." (*Id.* ¶ 66.) CCN appealed to DHS, and DHS corrected the error. (*Id.* ¶¶ 68–70.)

Later, Higginbotham told CCN that she knew someone in its office had contacted DHS, became visibly angry, and told CCN staff that they were not allowed to speak to DHS or the Governor's office, which CCN claims is incorrect. (*Id.* ¶ 71.) The Coalition then entered a new practice that prevents grantees from reviewing their financial scorecards. (*Id.* ¶ 72.) And "after a perceived slight by the Governor's office," Higginbotham "expressed her suspicion" that CCN's CEO was "responsible for the perceived slight, apparently because CCN had called the Governor's office to find a telephone number." (*Id.* ¶ 73.) CCN alleges that, after this event, it suffered increasingly costly reporting demands from the Coalition. (*Id.* ¶ 74.)

The Coalition monitored CCN again in 2025. (*Id.* ¶ 107.) It continued to impose a variation of the reporting requirement and other costly demands. (*Id.* ¶¶ 109–125.) CCN described these as "arbitrary demand[s] with no plausible oversight purpose, unsupported by [the Coalition's] own standards, that seemed to

5

do nothing but create more work and expense for CCN," and noted that the Coalition was improperly seeking information related to other funders. (*Id.* ¶¶ 124, 126.)

CCN alleges that the Coalition, and specifically Higginbotham, attempted to harm it in other ways. (*Id.* ¶ 127.) First, in 2024, after the then-chair of CCN's board attended a public legislative meeting and asked a question about Pennsylvania's funding allocation process, Higginbotham attempted to remove CCN from the Coalition's membership for breaching the section of the membership agreement that prohibits members from soliciting or lobbying for funds that would benefit their county exclusively. (*Id.* ¶¶ 128–134.) Despite Higginbotham's attempt, the Coalition's membership committee did not revoke CCN's membership in the Coalition. (*Id.* ¶ 137.) Second, in 2025, when a state representative who represents some of the areas CCN serves asked Higginbotham about "the formula by which domestic violence funding was allocated," Higginbotham told a subordinate she planned to retaliate against CCN because CCN had been responsible for the state representative's question. (*Id.* ¶ 139.)

The conflict between the two entities continued on November 18, 2025, when Higginbotham sent a letter to CCN. (*Id.* ¶ 140.) The letter purported to notify CCN of "a material breach in performance, as well as to ask [CCN] to provide a corrective action plan that immediately cures the issues described [in the

6

letter] within 10 business days." (*Id.* ¶ 141.)  It threatened to terminate CCN's contract with the Coalition on December 3, 2025, if CCN failed to provide a corrective action plan.  (*Id.* ¶ 144.)  But the letter merely stated that CCN had failed to comply with Coalition standards for three successive fiscal monitoring periods without identifying a specific breach, and CCN alleges that its agreement with the Coalition gave the Coalition no right to demand a corrective action plan. (*Id.* ¶¶ 142–43.)  CCN responded to the letter and addressed each claim issued in its monitoring report, provided action plans, and offered to comply with other demands if the Coalition paid the associated costs.  (*Id.* ¶¶ 147–49.)[5]

The Coalition sent a series of letters justifying its demands, and CCN disputes the reasoning expressed in those letters.  (*Id.* ¶¶ 153, 157.)  The Coalition then claimed that DHS required it to make the extensive demands it had levied on CCN, but when CCN obtained the master agreement between DHS and the Coalition, no such requirements were present.  (*Id.* ¶ 153, 155–56.)  Then, the Coalition claimed its demands stemmed from "Uniform Guidance" found in the Code of Federal Regulations, but those regulations also do not require the demands the Coalition listed, and CCN met the standards imposed by those regulations.  (*Id.*

---

[5] "Additionally, CCN gave notice of a grant controversy relating to not only [the Coalition's] demands but also its anticipatory breach of the contract, which by the terms of the Grant Agreement [the Coalition] must respond to within 120 days . . . The 120 days expired on April 17, 2026, and [the Coalition] did not respond." (Doc. 1, ¶¶ 150–51.)

7

¶¶ 157–161.)  The Coalition also claimed its reporting requirement was "easy to accomplish" and a "best practice," which Crisis disputes.  (*Id.* ¶¶ 163–165.) Moreover, although the Coalition told CCN that it needed to comply with the standard terms of its sub-grant agreements like other programs who received funds from the Coalition, CCN alleges that it reviewed the financial reporting of other Coalition Grantees and found that none of them "complied with [the Coalition's] demands of CCN."  (*Id.* ¶¶ 166–70.)  Later, although the Coalition initially recognized that CCN had submitted a corrective action plan, it then twice claimed that CCN had failed to provide a corrective action plan.  (*Id.* ¶¶ 171–73.)  And CCN also avers that the Coalition later claimed that CCN had not provided a required description of a grant controversy when, in fact, it had.  (*Id.* ¶¶ 177–181.)

On March 20, 2026, the Coalition sent CCN a letter titled "[The Coalition's] Notice of Non-Renewal of Grant Agreement with Crisis Center North, Inc."  (*Id.* ¶ 185.)  The letter described each of CCN's alleged failures to comply with the Coalition's demands.  (*Id.* ¶ 186.)  It stated that the letter served as notice that the Coalition would not review CCN's grant.  (*Id.* ¶ 187.)  CCN alleges that the grant period ended on June 30, 2026, and that grantees apply for renewal of their grants when the grant period ends.  (*Id.* ¶ 188.)  Moreover, CCN alleges that the March 2026 letter offers "no theory to justify [the Coalition's] claimed authority to preemptively deny a grant before applications have even been received, and

certainly not on a pretextual basis." (*Id.* ¶ 189.)  The Coalition's board of directors allegedly approved the decision to preemptively deny CCN's grant.  (*Id.* ¶ 190.) Moreover, the Coalition informed CCN in a January 7, 2025, letter that it would not allocate funds from a grant from the Richard King Mellon Foundation unless CCN came "into compliance with the fiscal standards in this letter." (*Id.* ¶ 193.) CCN normally receives about $67,750 in funding from that source per year.  (*Id.* ¶ 195.)

CCN contacted DHS Executive Policy Specialist Louie Marven, who works "in the area of domestic violence," to ask for help with the Coalition's notice preemptively denying CCN's intended grant renewal application.  (Doc. 1, ¶¶ 197– 98.) When a different DHS official finally responded, she indicated that the Coalition was responsible for "subgrantee network management," and directed CCN to the Coalition.  (*Id.* ¶ 202.)

CCN avers that it will suffer substantial harm due to the Coalition and DHS's actions.  (*See id.* ¶ 204.)  CCN alleges that it will lose more than $640,000 in grant funding if the Coalition refuses to renew its grant agreement with CCN. (*Id.* ¶ 205.)  It will also lose the $67,750 it normally receives through the Coalition from the Richard King Mellon Foundation, which accounts for about twenty percent of its annual budget.  (*Id.* ¶ 206.)  CCN's reputation will also suffer, and

losing this funding will also reduce or completely eliminate its ability to provide services to victims of domestic violence.  (*Id.* ¶¶ 206–16.)

CCN sued Defendants on April 20, 2026.  (Doc. 1.)  It attached a number of exhibits to its complaint, including the grant agreement, Doc. 1-2, the master grant agreement, Doc. 1-3, and the membership agreement, Doc. 1-6.  In the complaint, it raises the following claims: 1) Count I brings a 42 U.S.C. § 1983 claim under the First, Fifth, and Fourteenth Amendments to the United States Constitution against DHS and the Coalition; 2) Count II brings a freestanding claim alleging that the Coalition violated Article I, §§ 1, 7, and 20 of the Constitution of the Commonwealth of Pennsylvania; 3) Count III brings a breach of contract claim against the Coalition arising from the Coalition's alleged breach of its grant agreement with CCN; 4) Count IV brings a breach of contract claim against the Coalition arising from the Coalition's alleged breach of its membership agreement with CCN; and 5) Count V brings another breach of contract claim against the Coalition based on a violation of an implied covenant of good faith and fair dealing.  (Doc. 1, ¶¶ 217–264.)

DHS filed a motion to dismiss CCN's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on June 12, 2026.  (Doc. 23.)  The Coalition filed a motion to dismiss CCN's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on June 19, 2026.  (Doc. 29.)  CCN filed an omnibus brief in opposition

to those two motions to dismiss on June 26, 2026.  (Doc. 37.)  DHS and the

Coalition filed reply briefs on July 10, 2026, (Docs. 44, 45.)  CCN also filed a

motion for entry of default against DHS, DHS filed a brief in response, and CCN

filed a reply.  (Docs. 19, 25, 28.)

### JURISDICTION AND VENUE

CCN brings a 42 U.S.C. § 1983 claim against Defendants, so the court has

jurisdiction under 28 U.S.C. § 1331.  (Doc. 1, ¶¶ 217–32.)  Moreover, the court has

jurisdiction over CCN's state law claims under 28 U.S.C. § 1367(a).  Venue is

proper in this district because a substantial amount of the events giving rise to

CCN's complaint took place in this district.

### STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.

v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting

*Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to

survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir.

2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint

11

survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n. 7 (3rd Cir. 2020).

## DISCUSSION

### A. The Court Will Deny CCN's Application for Entry of Default Against DHS.

CCN requested that the Clerk of Court enter default against DHS "for failure to plead or otherwise defend against this action in a timely manner" pursuant to Federal Rule of Civil Procedure 55(a).  (Doc. 19, p. 1.)  The parties briefed the issue of whether the court should grant or deny that application.  (Docs. 25, 28.)

DHS opposes CCN's application for entry of default because CCN failed to establish through an affidavit of service that it properly served DHS and the Pennsylvania Office of the Attorney General, CCN failed to seek DHS's concurrence before filing the application, and DHS is participating in the case with meritorious defenses and its delay did not subject CCN to prejudice.  (Doc. 25, pp. 5–15.)  In response, CCN argues that its application is not a motion, so it did not need to seek the Coalition's concurrence in its application, DHS was properly

served, CCN seeks an entry of default, not an entry of default judgment, and DHS's defenses are not meritorious. (Doc. 28, pp. 5–19.)

The court notes that default has not yet been entered against DHS by the Clerk of Court. If the Clerk of Court had entered default against DHS, the court would set it aside. The United States Court of Appeals for the Third Circuit "does not favor entry of defaults or default judgments." *Hill v. Williamsport Police Dep't.*, 69 Fed. App'x 49, 51–52 (3d Cir. 2003) (quoting *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984)). "A court must consider the following factors in determining whether an entry of default should be set aside: '(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; (3) whether the default was the result of the defendant's culpable conduct.'" *Daughtry v. Kauffman*, No. 3:17-CV-0442, 2019 WL 118600, at *2 (M.D. Pa. Jan. 7, 2019) (quoting *$55,518 in U.S. Currency*, 728 F.2d at 195). The court finds that factor two carries the analysis here; as explained below, DHS has meritorious defenses to CCN's complaint. Moreover, CCN argues that "DHS['s] failure to timely respond has already caused delay in this case and its failures to act to ameliorate that delay may be taken as an indication that DHS intends to continue to delay and cause additional prejudice to CCN." (Doc. 28 p. 14.) But DHS's ripe motion to dismiss is pending. (Doc. 23.) Therefore, the court will deny CCN's application for entry of default against DHS, Doc. 19.

**B. The Court will Dismiss CCN's 42 U.S.C. § 1983 Claim Against DHS With Prejudice.**

DHS moves to dismiss CCN's claims against it under Federal Rule of Civil Procedure 12(b)(6).  (Doc. 24, p. 4.)  In its brief in support of its motion to dismiss, DHS claims that it is only named as a defendant to Count I of CCN's complaint.  (*Id.* at 2.)  In its brief in opposition to the motions to dismiss, CCN does not clearly dispute that DHS is only named as a defendant to Count I.  (*See* Doc. 37, pp. 1– 22.)  Moreover, to the extent CCN intended to raise Count II against DHS, DHS is only mentioned once in that Count in the following sentence: "[The Coalition], acting on behalf of DHS and the Commonwealth and approved by DHS, used tactics that were arbitrary and retaliatory against CCN for the purpose of retaliating against CCN for protected speech, especially speech to the government."  (Doc. 1, ¶ 238.)  The rest of the specific allegations in that count relate to the Coalition's conduct, not that of DHS.  (*See id.* ¶¶ 233–242.)  A complaint must give defendants "fair notice" of what claims a plaintiff is raising against the defendants and the grounds upon which the claims rest. *Carpenters Health v. Mgmt. Res. Sys. Inc.*, 837 F.3d 378, 384 (3d Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); Fed. R. Civ. P. 8(a).  Count II's allegations do not put DHS on notice that CCN intends to raise a claim against it in that Count.  Therefore, the court construes CCN's complaint to bring only its 42 U.S.C. § 1983 due process

14

claim against DHS, not the state law claims alleged in Counts II–V.  (*See* Doc. 1, ¶¶ 217–264.)

Count I brings a claim against DHS under 42 U.S.C. § 1983.  (*Id.* ¶¶ 217–232.)  "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law."  *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting 42 U.S.C. § 1983).  Neither a state nor its agencies are "person[s]" under § 1983.  *Moore v. Filer*, No. 3:22-CV-2073, 2024 WL 264679, at *3 (M.D. Pa. Jan. 24, 2024) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).  Courts throughout the United States Court of Appeals for the Third Circuit have recognized that DHS is not a "person" under § 1983.  *Guilday v. Crisis Ctr. at Crozer-Chester Med. Ctr.*, No. CV 21-2010, 2022 WL 507484, at *3 (E.D. Pa. Feb. 17, 2022), *aff'd*, No. 22-1519, 2022 WL 17484328 (3d Cir. Dec. 7, 2022) (quoting *Will*, 491 U.S. at 70–71; *Evans-Sampson v. Pa. Dept of Hum. Servs.*, No. 20-CV-0653, 2020 WL 1166493, at *3 (E.D. Pa. Mar. 10, 2020) (collecting cases), *aff'd sub nom. Evans-Sampson v. Pa. Dep't of Hum. Servs.*, 838 F. App'x 712 (3d Cir. 2020); *Leuthe v. Pennsylvania Dep't of Hum. Servs.*, No. 2:24-CV-00714, 2024 WL 2728572, at *3 (W.D. Pa. May 28, 2024); *Biesecker ex rel. Biesecker v. Cerebral Palsy Ass'n, Chester Cnty. Disabilities Servs.*, No. CV 17-2586, 2018 WL 3416384, at *6–7 (E.D. Pa. July 13, 2018) (citing *Will*, 491 U.S. at 71); *see also Boone v. Pa. Office of Voc. Rehab.*,

15

373 F. Supp. 2d 484, 498–99 (M.D. Pa. 2005) (holding that a plaintiff could not assert a claim for injunctive relief under § 1983 against a state agency) (citing *Will*, 491 U.S. at 71 n.10).

CCN argues that DHS is subject to suit under § 1983 because Pennsylvania waived its sovereign immunity as to suits about the Commonwealth's control over personal property.  (Doc. 37, p. 9.)  It cites 42 Pa. Cons. Stat. § 8522(b)(3), which states that the Commonwealth waives sovereign immunity as to the "care, custody or control of personal property in the possession or control of Commonwealth parties, including Commonwealth-owned personal property and property of persons held by a Commonwealth agency . . . ."  But this waiver "does not apply to suits in federal court." *Eyajan v. Dep't of Driving Transp.*, No. 22-3011, 2023 WL 3034329, at *2 (3d Cir. Apr. 21, 2023) (citing *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020)).  That is because Pennsylvania specified that its waivers of sovereign immunity contained in 42 Pa. Cons. Stat. § 8522 "shall [not] be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."  42 Pa. Cons. Stat. § 8521(b); *see Downey*, 968 F.3d at 310 (quoting 42 Pa. Cons. Stat. § 8521(b)).  So, Pennsylvania's waiver of sovereign immunity as to claims arising from the Commonwealth's care, custody, and control of personal property does not save CCN's § 1983 claim against DHS.

16

Neither does Article I, § 11 of the Constitution of the Commonwealth of Pennsylvania. CCN argues that this provision constitutes another waiver of sovereign immunity that allows for its § 1983 claim against the Commonwealth because it "provides, inter alia, that "every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay." (Doc. 37, p. 9–10 (quoting Pa. Const. art. 1, § 11).) CCN ignores the second sentence of that provision, which states that "Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." Pa. Const. art. 1, § 11. Building off that provision, 1 Pa. Cons. Stat. § 2310 states that:

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.

1 Pa. Cons. Stat. § 2310. Apart from 42 Pa. Cons. Stat. § 8522(b)(3), CCN identifies no other specific waiver of sovereign immunity that would allow its § 1983 claim to proceed against DHS. (*See* Doc. 37, pp. 9–16.) The constitutional provision CCN cites, Pa. Const. art. 1, § 11, does not provide the blanket sovereign immunity waiver CCN claims it does. Therefore, the court will dismiss CCN's § 1983 claim against DHS with prejudice because amendment of that claim would be

17

futile as to DHS.  *Walker v. Kemp*, 587 F. Supp. 3d 232, 248 (E.D. Pa. 2022)

(quoting *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000)).

### C. The Court will Dismiss the Due Process Claims Raised in Count I against the Coalition.

Count I of CCN's complaint brings a 42 U.S.C. § 1983 claim against the

Coalition for violating the First, Fifth, and Fourteenth Amendments of the United

States Constitution.  (Doc. 1, ¶¶ 217–23.)  Specifically, CCN alleges that the

Coalition violated its due process rights by "contravene[ing]" its own established

procedures.  (*Id.* ¶ 221–222.)  CCN claims the Coalition violated its substantive

due process rights by retaliating against it in the form of unsatisfiable demands,

imposing extreme costs on CCN, and "purporting to prevent CCN from applying

for and/or receiving future grants on the basis of arbitrary, unexplained, and

unsupported demands."  (*Id.* ¶¶ 224.)  CCN also alleges that the Coalition

retaliated against it in violation of the First Amendment after CCN Center officials

spoke to the Office of the Governor and Pennsylvania state legislators.  (*Id.* ¶¶

225–229.)  And finally, CCN avers that the Coalition violated the Equal Protection

Clause of the Fourteenth Amendment by "by imposing demands upon it in order to

fairly compete for federal and state funding that it did not place on other grantees,

as evidenced by the fact that, of the PCADV grantees whose financial reports were

reviewed by CCN . . . ."  (*Id.* ¶ 231.)

18

The Coalition argues that the court should dismiss the procedural and substantive due process claims alleged against it in Count I because the Coalition is not a state actor and because the Coalition did not deprive CCN of a constitutionally protected right.  (Doc. 30, p. 12.)  The court addresses each argument in turn.

### 1.  CCN Sufficiently Pleads, at This Stage, That the Coalition is a State Actor for the Purpose of CCN's 42 U.S.C. § 1983 Claim.

The Coalition notes that the complaint "attempts to treat [the Coalition] as a state actor based on its role in administering grant funds, its contractual relationship with DHS, its oversight of subgrantees, and DHS's alleged failure to intervene after [CCN] complained." (*Id.* at 13.)  It argues that none of these allegations establish that it is a state actor under the three state action tests prescribed by the Third Circuit in *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995)).  (*Id.* at 14.)  First, it argues that the administration and distribution of grant funding is not an exclusive governmental function.  (*Id.* at 14–15.)  It argues that courts consistently hold that the receipt or administration of government funding does not transform a private entity into a state actor.  (*Id.* at 14–15 (collecting cases).)  Private nonprofit corporations frequently administer grants, the Coalition claims, so that activity is not exclusively governmental.  (*Id.* at 15.)  Moreover, the Coalition administers both public and private grants, so it does not exclusively

administer government funding.  (*Id.*)  Accordingly, it is not a state actor under the "public-function test."  (*Id.*); *see Kach*, 589 F.3d at 646.

Second, the Coalition argues that CCN has not sufficiently alleged that the Coalition is a state actor "under a joint-participation or state-compulsion theory" because DHS did not "Direct[] or influence[]" the challenged conduct.  (Doc. 30, p. 16); *see Kach*, 589 F.3d at 646.  According to the complaint, the Coalition acted alone, and DHS declined to interfere with the sub-grant process, so it did not act in concert with the Coalition or coerce it in any way.  (Doc. 30, p. 16.)

Third, the Coalition argues it is not a state actor under the symbiotic relationship test because it is not sufficiently intertwined with the Commonwealth of Pennsylvania through DHS. (*Id.* at 16–17.)  It recognizes that the complaint alleges that the Coalition acts as a conduit for funding received through DHS, but it does not allege that DHS controlled the Coalition's decision making with regard to those funds or otherwise participated in their distribution.  (*Id.* at 17.)  Thus, it does not have a symbiotic or interdependent relationship with DHS.  (*Id.*)

In response, CCN argues that the Coalition is a state actor when it distributes "public money."  (Doc. 37, p. 14.)  It claims the Coalition "has been delegated the authority by the State, through DHS, to administer and distribute grant funding to sub-grantees through the Master Grant Agreement. As such, [the Coalition] is acting under the color of law and can be held liable under § 1983."  (*Id.* at 15.)

20

Because the Coalition does not merely receive government funding, but also distributes it and monitors its use subject to DHS's supervision and control, CCN argues that it is a state actor. (*Id.* at 15–16.)

In reply, the Coalition again argues that it does not qualify as a state actor under any of the three tests set forward in *Kach*, 589 F.3d at 646. (Doc. 45, pp. 6–12.) That is: (1) the Coalition's duty of distributing and monitoring grant funding is not a function traditionally reserved for the state; (2) DHS did not direct or influence the Coalition to refuse to renew CCN's grant agreement; and (3) that it is not a joint participant in the non-renewal of the grant agreement. (Doc. 45, pp. 7–12.)

The Fourteenth Amendment applies to state actors, not private citizens. *Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 160 (3d Cir. 2017) (quoting *Kach*, 589 F.3d at 646), *cert. denied sub nom. Borrell v. Richer*, 584 U.S. 993 (2018). And 42 U.S.C. § 1983 "holds wrongdoers liable for violating plaintiffs' rights" when those wrongdoers act "under color of state law." *Boyd v. Shriners Hosps. for Child.*, No. 25-1183, 2026 WL 1005549, at *2 (3d Cir. Apr. 14, 2026) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995)). A state actor and an individual acting under color of state law are the same. *See Borrell*, 870 F.3d at 160 (quoting *United States v. Price*, 383 U.S. 787, 794 n.7 (1966)). So, to state a § 1983 claim against the Coalition, CCN must allege it is a state actor. *See id.* at 160; *Parker*,

21

158 F.4th at 481.  In determining whether a specific individual or entity is a state actor, the court asks whether the state "exercised control" over the specific conduct that gave rise to the plaintiff's constitutional claim.  *Wang v. Univ. of Pittsburgh*, --- F.4th----, No. 25-1816, 2026 WL 1959171, at \*13 (3d Cir. July 7, 2026) (quoting *Kach*, 589 F.3d at 649).  When the state's involvement in the challenged conduct or activity is not clear, the court employs "three broad tests generated by Supreme Court jurisprudence to determine whether state action exists."  *Borrell*, 870 F.3d at 160 (quoting *Kach*, 589 F.3d at 646).  They are:

> (1) [W]hether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.

*Kach*, 589 F.3d at 646 (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)) (citation modified).  The Third Circuit has recognized that the state action doctrine is "labyrinthine," *Leshko v. Servis*, 423 F.3d 337, 338 (3d Cir. 2005).  Moreover, "both *Leshko* and *Kach* emphasize that the state action inquiry is fact-specific, and thus resistant to fixed categorization."  *Oliver v. Serv. Emps. Int'l Union Loc. 668*, 415 F. Supp. 3d 602, 609 n.9 (E.D. Pa. 2019) (citing *Leshko*, 423 F.3d at 339; *Kach*, 589 F.3d at 646).

Here, the complaint alleges that the Coalition "is a state actor when acting in its grant-making capacity, as the agent of DHS and the Commonwealth of

22

Pennsylvania as well as, ultimately, the United States." (Doc. 1, ¶ 219.) The specific conduct CCN challenges in Count I ranges from the Coalition's alleged deviation from its grant funding procedures to its specific retaliation against CCN. (Doc. 1, ¶¶ 217–232.) Although CCN's brief in opposition to the motions to dismiss does not situate its state action argument under a specific *Kach* test, Doc. 37, pp. 14–15, the court finds, accepting as true the complaint's allegations and drawing all reasonable inferences therefrom in CCN's favor, that CCN has sufficiently pleaded that the Coalition qualifies as a state actor with regard to its administration of grant funding and agreement with CCN.

CCN alleges that on at least one occasion, DHS intervened in a conflict between CCN and the Coalition and exercised control to "correct" a clear error in one of the Coalition's financial estimations of CCN. (Doc. 1, ¶¶ 63–70.) Moreover, CCN alleges that the Coalition purported to make specific requests of CCN on DHS's behalf. (*Id.* ¶¶ 153–55.) And finally, in a section of the grant agreement titled "monitoring," the agreement specifically states that:

> The Grantee agrees to make available during the term of the Grant Agreement and for the records retention periods set forth in the Grant Agreement, materials for inspection and audit by any authorized representative of the Secretary of the Department of Human Services ("DHS") who may accompany the PCADV on any monitoring and evaluation visits.

(Doc. 1-2, p. 63.) Thus, although the Coalition alleges that DHS was not involved in the monitoring and non-renewal of CCN's grant agreement, Doc. 30, p. 16, Doc.

23

45, p. 10, the court finds dismissal at this stage is premature. This is because CCN's allegations at least give rise to the inference that DHS encouraged and exercised some joint participation in the general monitoring of the grant agreement and the ultimate decision not to renew that grant agreement. *Kach*, 589 F.3d at 646; *Billups v. Penn State Milton S. Hershey Med. Ctr.*, 910 F. Supp. 2d 745, 757 (M.D. Pa. 2012). Accordingly, the court will deny the Coalition's motion to dismiss Count I on the basis of its state action argument.[6]

### 2. CCN Does not Allege the Coalition Deprived it of a Constitutionally Protected Interest, so the Court Will Dismiss CCN's Due Process Claims Against the Coalition.

To state a procedural due process claim, a plaintiff must plead the following three elements: (1) they were deprived of life, liberty, or property; (2) by a state actor; (3) without due process of law. *Parker v. N.J. Motor Vehicle Comm'n*, 158 F.4th 470, 481 (3d Cir. 2025) (first citing *Reed v. Goertz*, 598 U.S. 230, 236 (2023); then citing *Blum v. Yaretsky*, 457 U.S. 991, 1002–03 (1982); and then citing U.S. Const. amend. XIV, § 1), *petition for cert. docketed*, No. 25-1351 (U.S. Jun. 4, 2026). "To establish a substantive due process claim, a plaintiff must prove (1) the particular interest at issue is protected by the substantive due process clause

---

[6] The court notes that this holding merely reflects that CCN has sufficiently alleged, for the purpose of withstanding a motion to dismiss, that the Coalition qualifies as a state actor as to the challenged conduct. To properly establish this element of its § 1983 claim on its motion for a preliminary injunction or at summary judgment, CCN will need to provide more specific allegations with citations to specific facts that demonstrate the Coalition's state actor status under the relevant legal standard.

and (2) the government's deprivation of that protected interest shocks the conscious." *Hazzouri v. W. Pittston Borough*, 416 F. Supp. 3d 405, 416 (M.D. Pa. 2019) (quoting *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 190 (3d Cir. 2009)) (internal quotation marks and alterations omitted). Only those interests that are "'fundamental' under the United States Constitution'" warrant substantive due process protection. *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 140 (3d Cir. 2000) (collecting cases).

The parties dispute whether CCN has asserted an interest that warrants procedural and substantive due process protection. The Coalition argues that "the loss of discretionary grant funding, or the expectation of future funding, does not implicate constitutional protections," so the court should dismiss Count I's procedural and substantive due process claims. (Doc. 30, p. 18.) It first notes that there is no constitutionally protected property interest in a government contract unless the contract involves "welfare benefits tenure, or is terminable only for cause," and claims that a party has no property interest in obtaining future government contracts. (*Id.* at 18–19.)

Here, the Coalition argues, CCN had no protected property interest in the renewal of the funding agreement it executed with the Coalition because that agreement spanned a limited term and gave the Coalition extensive discretion as to its funding decisions. (*Id.* at 19–20.) CCN's grant from the Coalition spanned a

25

defined term that ended on June 30, 2026, and renewal of that grant required a new approval process. (*Id.* at 20.) Moreover, the Coalition's standard grant agreement provides that the Coalition may terminate the grant for convenience and that a grant recipient is "entitled only to payment for services rendered—not damages or lost profits." (*Id.*) CCN's allegations also show that the Coalition, through the conditions it imposed on CCN and its denial of CCN's attempt to apply for a new grant, exercised a level of discretion over its funding decisions that defeats CCN's allegations of constitutional protection of those funds. (*Id.* at 20–21.) And finally, the Coalition argues that CCN's expectation of obtaining future government contracts or discretionary funding from the Coalition does not form a constitutional property interest. (*Id.* at 21.)

CCN argues it has a protected property interest in its "contractual relationship with DHS's agent [the Coalition]." (Doc. 37, pp. 11–12.) It argues that this contractual relationship, formed through the parties continual funding agreements over the course of years, cemented CCN's opportunity to continue to apply for grant funding. (*Id.* at 12.) In essence, it appears to argue that the parties formed an implied-in-fact contract through CCN's continued receipt of grant funding from the Coalition, that contractual relationship guaranteed that CCN would be permitted to continually apply for grant funding in the future, and that

guarantee, along with any guarantee in the grant agreement itself, constituted a protected property interest.  (*See id.* at 12, 37.)

In reply, the Coalition notes that CCN fails to identify a "contractual, statutory, or regulatory provision requiring [the Coalition] to renew the Grant Agreement, permit [CCN] to apply for future funding, or award funding absent cause for denial."  (Doc. 45, p. 13.)  Instead, the complaint notes that the grant agreement between CCN and the Coalition would end on June 30, 2026, and that future funding depended on a subsequent application.  (*Id.*)  Moreover, the Coalition claims that CCN cites no authority indicating that "the opportunity to apply for future discretionary funding constitutes a protected property interest." (*Id.* at 13.)  A property interest conferred through a contract receives Fourteenth Amendment protection only when it confers a protected status or where it may be terminated for cause, the Coalition argues, and contract rights asserted on the basis of future or discretionary funding decisions do not fall into those two categories. (*Id.* at 13–14.)  Beyond that, the Coalition argues that any extrinsic evidence about the parties' business relationship cannot modify the plain terms of the grant agreement to create a new contractual right and property interest.  (Doc. 45, pp. 15–20.)

CCN's asserted interest, which it claims warrants procedural and substantive due process protection, is its "property interest in its contractual relationship with

27

[the Coalition], which includes the opportunity to continue to apply for grant funding – funding which through the parties course of dealing over the years, was continually renewed and only stopped as a result of [the Coalition's] retaliatory actions aimed at [CCN]." (Doc. 37, p. 12.)[7] That interest is insufficient to support a substantive due process claim because it is not "'fundamental' under the United States Constitution.'" *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 140 (3d Cir. 2000) (collecting cases). Indeed, the "Third Circuit has repeatedly held that contract rights are among 'those state-created property interests' that are 'deemed unworthy of substantive due process'" *Finley v. City of Phila.*, No. 11-1205, 2011 WL 3875371, at *4 (E.D. Pa. Aug. 31, 2011) (quoting *Nicholas*, 227 F.3d at 140) (citing *Reich v. Beharry*, 883 F.2d 239, 243 (3d Cir.1987)). Even if the court accepts that CCN has an implied-in-fact contract with the Coalition that preserves its right to continually apply for grant funding, that does not qualify as a fundamental interest worthy of substantive due process protection. *See Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 155 (3d Cir. 2018).[8]

---

[7] CCN appears to have presented this argument in response to DHS's motion to dismiss. (*See* Doc. 37, p. 12.) However, the Coalition argued that CCN failed to allege the deprivation of a right protected by the Fourteenth Amendment, Doc. 30, pp. 18–21, and CCN did not argue for a separate property interest elsewhere in its brief. (*See* Doc. 37, pp. 6–22.)

[8]In *Newark Cab Association*, the Third Circuit recognized that the plaintiff's asserted property interests, which were the loss of value of their taxi medallions and their loss of the right to be "be the exclusive provider of ride-for-hire services in Newark . . ." did not qualify for substantive due process protection. 901 F.3d at 155–56. The court held that interest was "akin to those we have previously rejected," like the:

28

CCN's purported interest in the grant agreement and in continuing to apply for grant funding, allegedly conferred through its implied-in-fact contract with the Coalition, is not entitled to procedural due process protection under the Fourteenth Amendment, either.  (Doc. 37, p. 12.)  Even if the court assumes that contract exists and that the Coalition is a state entity, that type of contract does not qualify as one of the few types of contracts with a state entity that gives rise to procedural due process protection.  *See Linan-Faye Const. Co. v. Hous. Auth. of City of Camden*, 49 F.3d 915, 932 (3d Cir. 1995).  As the Coalition notes, Doc. 30, p. 19; Doc. 45, pp. 12–14, the Third Circuit recognizes that two types of contract rights are "recognized as property protected under the Fourteenth Amendment . . . ." *Linan-Faye Const. Co.*, 49 F.3d at 932.  They are:

> (1) [W]here "the contract confers a protected status, such as those 'characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits'"; or (2) where "the contract itself includes a provision that the state entity can terminate the contract only for cause."

---

"[A]bility to earn a living" and being terminated from a public job, *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 n.12 (3d Cir. 2006), being actively prevented from winning city contracts in violation of a consent decree with the city, *Indep. Enters. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1179-80 (3d Cir. 1997), and losing contracts because a plaintiff was termed a "crook" by a government employee, *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 401-04 (3d Cir. 2000).

(*Id.*)

*Id.* (quoting *Unger v. Nat'l Residents Matching Program,* 928 F.2d 1392 (3d Cir.1991)); *Baraka v. McGreevey*, 481 F.3d 187, 207 (3d Cir. 2007) (quoting *Linan-Faye Const. Co.*, 49 F.3d at 932); *see also Reach Commc'ns Specialists, Inc. v. Williams*, 655 F. Supp. 3d 351, 364 (E.D. Pa. 2023) (listing the same two types of contracts conferring property interests) (quoting *Baraka*, 481 F.3d at 207).  In its brief in opposition, CCN makes no attempt to explain how the grant agreement or its interest in continuing to apply for grant funding confers on it a protected status, and it does not identify any allegation in its complaint claiming that its implied-in-fact contract or the grant agreement with the Coalition was terminable for cause only.  (Doc. 37, pp. 6–22.)

Instead, it cites *Westmoreland Hum. Opportunities, Inc. v. Walsh*, 246 F.3d 233, 241 (3d Cir. 2001), in support of the proposition that "The Third Circuit has found that, under Pennsylvania law, 'contractual rights are classified as property interests,' specifically personal property," and thus, "[w]hile the prospective receipt of grant funds, without further context, my [sic] not be a property interest," the implied-in-fact contract with the Coalition created a contractual interest in CCN's ability to apply for future grant funding.  (Doc. 37, pp. 11–12.)  In *Westmoreland*, the Third Circuit considered whether an interest in a grant relationship qualified as a "legal or equitable interest[]" under 11 U.S.C. § 541(a)(1) in part by analyzing Pennsylvania law.  *Westmoreland*, 246 F.3d at 241.

30

That analysis is separate from the issue here, which is whether CCN's asserted property interest warrants Fourteenth Amendment due process protection.

Accordingly, the court will dismiss Count I to the extent it alleges procedural and substantive due process claims. However, because it is not yet clear to the court that amendment would be futile as to those claims, the dismissal will be without prejudice.

### D. The Court Will Dismiss CCN's Claim for Damages Pursuant to Count II of the Complaint, But Will Deny the Coalition's Motion to Dismiss that Claim as to the Request for Equitable Relief.

Count II brings a claim against the Coalition under Pa. Const. art. I, §§ 1, 7, and 20. (Doc. 1, ¶¶ 233–242.) Therein, CCN appears to raise substantive due process, procedural due process, and speech-related retaliation claims against the Coalition pursuant to those provisions of the Constitution of the Commonwealth of Pennsylvania. (*Id.*)

The Coalition argues that the court should dismiss Count II because "Pennsylvania does not recognize a private cause of action for damages for alleged constitutional violations." (Doc. 30, p. 21.) The Coalition is correct, and the court will dismiss Count II with prejudice to the extent that it seeks monetary damages from the Coalition. *Miles v. Zech*, 788 F. App'x 164, 167 (3d Cir. 2019) ("Pennsylvania does not have a statutory equivalent to § 1983 and does not recognize a private right of action for damages stemming from alleged violation of

the state constitution.") (citing *Gary v. Braddock Cemetery*, 517 F.3d 195, 207 n.4 (3d Cir. 2008)) (per curiam); *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011).

However, a plaintiff may seek injunctive relief to remedy a violation of the Pennsylvania Constitution. *Pocono Mountain*, 442 F. App'x at 688. CCN argues that Count II seeks equitable relief as well as money damages. (Doc. 37, p. 18; Doc. 1, ¶ 264 (seeking a "permanent injunction barring Defendants from wrongfully denying CCN renewal of the Grant Agreement or of the right to apply for renewal; restoring other grant funding wrongfully withheld; and enjoining CCN [sic] from wrongfully withholding additional funding").) The Coalition argues that CCN's allegations fail to tie the injunctive relief CCN seeks to an alleged constitutional violation, and that the allegations supporting Count II are conclusory and underdeveloped. (Doc. 30, p. 22.) In its reply brief, the Coalition argues that the court should dismiss Count II's claim for equitable relief because CCN fails to identify a "a protected property interest in future grant funding or in the opportunity to apply for it," and that CCN's "reliance on alleged reputational harm and retaliation does not change the result." (Doc. 45, p. 15.) Moreover, CCN's "alleged right and the requested remedy do not align." (*Id.*)

The Coalition does not cite precedent or engage with the merits of these claims apart from arguing that CCN's allegations are conclusory and its requested

32

relief does not match the claims it raises in Count II.  (*See* Doc. 30, pp. 21–22;

Doc. 45, p. 15.)    Without more comprehensive briefing on the issue, the court

declines to dismiss Count II, as far as it requests injunctive relief, at this stage.  *See*

*Karabin v. Norwin Sch. Dist.*, No. 2:24-CV-00769, 2025 WL 964011, at *23

(W.D. Pa. Mar. 31, 2025) (declining to dismiss a retaliation claim brought pursuant

to Pa. Const. Art. I, § 7, because the plaintiff sought both equitable relief and

money damages).

    **E. The Court will Dismiss Counts III and IV Without Prejudice Because CCN Did Not Respond to the Arguments for Dismissal the Coalition Presented in its Brief in Support and it Does Not Sufficiently Allege Breach and Resultant Damages.**

CCN brings two breach of contract claims against the Coalition in Counts III

and IV of the complaint.  (Doc. 1, ¶¶ 243–58.)  To state a claim for breach of

contract under Pennsylvania law, a plaintiff must allege: (1) a contract, complete

with its essential terms, existed; (2) the defendant breached the contract; and (3)

that the plaintiff suffered damages as a result.  *Doe v. Univ. of Scis.*, 961 F.3d 203,

211 (3d Cir. 2020) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v.*

*Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).  Count

III of CCN's complaint alleges that the Coalition breached the grant agreement.

(*Id.* ¶¶ 243–253.)  CCN first alleges that many "particulars" of the grant agreement

are unconscionable and unenforceable against it.  (*Id.* ¶ 245.)  Then, it claims that

the Coalition's audit of its use of grant funding went beyond the audit plan

33

prescribed in the contract and were "not supported" by the program standards set forth in the parties' contract.  (*Id.* ¶¶ 247–48.)  Moreover, it alleges that the Coalition failed to follow its own procedure for addressing "controversies" because it refused to address the "claim" CCN filed after the parties' disagreements began. (*Id.* ¶¶ 251–52.)

Count IV alleges the Coalition's membership agreement states that: "It is the role of [the Coalition] to work together with its Board of Directors to ensure that [the Coalition] and its member programs have the resources needed to serve victims of domestic violence and to advance initiatives that promote the end of violence against women."  (*Id.* ¶ 255.)  CCN alleges that "Instead of ensuring that [CCN], a member organization, had the resources to serve victims of domestic violence and advance initiatives that promote the end of violence against women, [the Coalition] manufactured a pretext to deny [CCN] those resources then acted to ensure that those resources were denied."  (*Id.* ¶ 256.)

The Coalition urges the court to dismiss both counts.  (Doc. 30, pp. 23–26.) As to Count III, the Coalition argues that it was contractually required to audit CCN to "verify sound fiscal and administrative conduct and compliance with [Coalition] Program Standards."  (*Id.* at 24.)  So, in auditing CCN, it complied with a duty imposed by the grant agreement; it did not breach a separate duty imposed by the same agreement.  (*Id.*)  And it claims that CCN's allegations relating to the

34

grant controversy review process also do not establish breach because the agreement states that timely-filed controversy claims are deemed denied after 120 days, and CCN's exhibits demonstrate that the Coalition reviewed CCN's claim. (*Id.*)  The Coalition argues that CCN merely cites its mission statement as the basis for the breach of the membership agreement asserted in Count IV, and that statement does not confer any obligation as to either party under the terms of the membership agreement.  (*Id.* at 24–25.)

Although it addresses Counts III and IV in its brief in opposition to DHS and the Coalition's motions to dismiss, CCN does not respond to these arguments. First, it merely argues that it has pleaded facts sufficient to establish its two breach of contract claims because it alleges the Coalition "engaged in a retaliatory crusade against CCN by imposing arbitrary demands on CCN, by attempting to remove CCN from Coalition Membership, and by denying CCN even the opportunity to apply for continued grant funding in 2026."  (Doc. 37, p. 19.)

Second, it argues that the court should consider the Coalition's "contractual duties" with an eye toward the parties' long relationship.  (*Id.* at 19–20.)  It argues that an implied-in-fact contract exists between it and the Coalition based on the Coalition's continuous awarding of grants to CCN, so CCN has a contract right "in continued funding or even to fairly compete for funding . . . ."  (*Id.* at 19–21.)  And CCN argues that the Coalition violated its duty of good faith and fair dealing with

regard to this implied-in-fact contract by "abus[ing] the power granted by its monopoly on this type of funding to impose terms that it could not justify."  (*Id.* at 20.)

As the court explained in detail *supra*, the Coalition provides two specific arguments in its brief in support of its motion to dismiss; first, CCN does not sufficiently allege that the Coalition breached a duty imposed by either the grant agreement or membership agreement, and second, CCN does not allege that it suffered damages attributable to the Coalition's breach of either agreement.  (Doc. 30, pp. 23–26 (displaying each of those arguments in subheadings).)  In its brief in opposition to Defendants' motion to dismiss, CCN does not explain which duties the two agreements imposed upon the Coalition, and its brief in opposition does not even contain the word "damages."  (Doc. 37, pp. 8–22; Doc. 45, pp. 24–25 (arguing again that the conduct alleged in the complaint does not constitute a breach of either agreement and noting that CCN failed to address its damages argument).)

CCN's argument that the court should consider the Coalition's contractual obligations in light of the parties' past funding relationship is not a meaningful response.  (Doc. 37, p. 19.)  At bottom, CCN argues that the Coalition breached an implied contract and ignored the duty of good faith and fair dealing that formed due to the parties' consistent dealings with one another by preventing CCN from

36

applying for future grants and interfering in CCN's "ability to perform" through excessive audit demands.  (*Id.* at 20–21.)  This argument does not save Counts III and IV because, in the complaint, those counts allege *specific* breaches of *specific* written agreements between the parties.  (Doc. 1, ¶¶ 243–58.)  They do not rely on a separate, implied-in-fact contract between the parties, and they do not allege that the coalition breached either the grant or the membership agreement by refusing to allow CCN to reapply for funding.  (*Id.*)

When a plaintiff fails to respond to arguments raised in a motion to dismiss, the court deems opposition to those arguments forfeited.  *Dreibelbis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008) (affirming a district court's dismissal of a plaintiff's claim where the district court refused to consider an argument in opposition to dismissal that the plaintiff did not raise); *see Mathews v. Abington Heights Sch. Dist.*, No. 3:22-CV-00959, 2024 WL 711610, at *6 (M.D. Pa. Feb. 21, 2024) ("[T]he filing of a brief in opposition to a motion to dismiss that fails to respond to a substantive argument to dismiss a particular claim results in the waiver or abandonment of that claim."); *Doe by & through Doe v. Methacton Sch. Dist.*, No. 25-1496, 2026 WL 900513, at *11 (E.D. Pa. Mar. 30, 2026) ("Plaintiffs do not respond to Defendant's argument that an action for enforcement under § 1983 is available for Title IX. This alone is enough for dismissal, as Plaintiffs have waived this claim.") (citing *Perez v. IMA Grp.*, No. CV 23-4367, 2024 WL

2925960, at *2 (E.D. Pa. June 10, 2024).  Thus, the court could deem the Coalition's arguments unopposed and dismiss Counts III and IV on that basis.

Moreover, the Coalition's arguments have merit.  Count III claims that the coalition breached the grant agreement by ignoring the audit procedures outlined in the grant agreement and "deman[ded] separate, costly, and unnecessary actions . . . that have no basis in" the grant agreement or the audit clause.  (Doc. 1, ¶¶ 247–249.)  "To properly allege a breach of contract, a party needs to point at a specific provision of the document the counterparty breached." *Philidor Rx Servs. LLC v. Polsinelli PC*, 552 F. Supp. 3d 506, 513 (E.D. Pa. 2021), *aff'd*, No. 22-2836, 2023 WL 6290746 (3d Cir. Sept. 27, 2023).  In Count III, CCN does not specify which of the Coalition's actions went outside the scope of the audit policy integrated into the grant agreement or allege that the grant agreement contains a provision that limits the Coalition's monitoring capabilities to those set forth in the audit policy that it violated in imposing harsher demands on CCN.  (Doc. 1, ¶¶ 247–249.)  And the audit policy itself states that "DHS provides the following audit requirements in accordance with the Commonwealth of Pennsylvania, Governor's Office, Management Directive 325.09, as amended January 10, 2022."  (Doc. 1-2, p. 68.)  A different provision in the grant agreement—cited by the Coalition in its brief in support of dismissing Count III, Doc. 30, pp. 23–24—states that the Coalition "is required to monitor grant compliance and performance of all grantees."  (Doc. 1-2,

38

p. 58.)  Therefore, it is not even clear to the court that the audit standards Count III cites apply to the Coalition instead of only DHS and the Federal Government.  (*See id.* at 68–73 (discussing submission requirements for state and federal audits and noting, under a section titled "remedies for noncompliance," that "[t]he subrecipient's failure to provide an acceptable audit may result in the DHS not accepting the report and initiating actions against the subrecipient . . . ").)

Then there is Count III's allegation that the Coalition breached the grant agreement because, in response to CCN submitting a claim, "[the Coalition] pretended in bad faith that CCN had not done so, or if it did its claim was in some unspecified way insufficient, or if it was sufficient, it was somehow barred by a six-month limitation, despite being delivered to PCADV less than a month after PCADV's threat."  (Doc. 1, ¶ 252.)  In short, CCN takes issue with the Coalition's alleged failure to respond to its controversy claim.  (*Id.*)  But as the Coalition points out in its brief in support, it is not clear that this is a breach of the grant agreement by the agreement's plain terms.  (Doc. 30, p. 24.)  The grant agreement provides that "If the [coalition] fails to issue a final determination" within 120 days of its receipt of the claim, "the claim shall be deemed denied."  (Doc. 1-2, p. 60.) So again, it is not clear to the court, assuming all allegations stated in the complaint are true and considering the documents attached thereto, that CCN alleges a breach of the grant agreement in Count III.  In alleging that the Coalition failed to comport

39

with its duty of good faith and fair dealing in carrying out the grant agreement, CCN merely repeats the allegations of Count III in similar terms.  (Doc. 1, ¶¶ 262.)

Count IV presents similar concerns, even assuming the court accepts that the following phrase creates a contractual obligation on the Coalition's behalf; "It is the role of [the Coalition] to work together with its Board of Directors to ensure that [the Coalition] and its member programs have the resources needed to serve victims of domestic violence and to advance initiatives that promote the end of violence against women."  (Doc. 1, ¶ 255.)  CCN alleges that the Coalition violated this provision by "manufactur[ing] a pretext to deny [CCN] those resources" and then "[acting] to ensure that those resources were denied."  (*Id.* ¶ 256.)  CCN does not specify in this count which resources it was denied that were promised in this provision of the membership agreement, so its allegation of breach is not clear.  (*See id.*)  Its good-faith-and-fair-dealing allegations related to the membership agreement are similarly vague as to which specific resources the Coalition denied it in allegedly pretextually revoking its membership.  (*See id.* ¶ 263; *see also* Doc. 30, p. 25 (noting the multiple different injuries CCN alleges but explaining that they remain unconnected to breaches of specific agreements).)

The court will dismiss Counts III and IV of CCN's complaint due to CCN's failure to respond to the Coalition's specific arguments and because CCN includes only conclusory allegations about the Coalition's alleged breaches of the grant and

40

membership agreements.  The court will dismiss these counts without prejudice to provide CCN an opportunity to plead these claims with greater specificity.[9]

### F. The Court Will Dismiss Count V with Prejudice Because CCN's Claim that the Coalition Violated the Duty of Good Faith and Fair Dealing Is Not an Independent Cause of Action.

The Coalition urges the court to dismiss Count V, which alleges a violation of the covenant of good faith and fair dealing as it applies to both the grant and membership agreements, with prejudice and consider it subsumed within Counts III and IV.  (Doc. 30, p. 26.)  CCN claims that "Even if correct, [the Coalition] overreaches in asking for this Count to be dismissed with prejudice. To the contrary, the only remedy available would be for the Count to be deemed subsumed into Counts III and IV for Breach of Contract."  (Doc. 37, p. 22.)

The Coalition is correct; "Pennsylvania does not allow an action for breach of the covenant of good faith and fair dealing separate from a breach of contract claim."  *Landan v. Wal-Mart Real Est. Bus. Tr.*, 775 F. App'x 39, 42 (3d Cir. 2019) (quoting *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013)) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 352 (3d Cir. 2016)).  Instead, any claim that the Coalition violated the duty of good faith and fair dealing in its execution of the

---

[9] Because the court dismisses CCN's breach of contract claims without prejudice, it does not address the Coalition's specific performance arguments.  (Doc. 45, pp. 20–23.)

41

grant or membership agreements is subsumed within Counts III and IV, and the Court will dismiss Count V with prejudice.  *See Burton*, 707 F.3d at 432–33.

### CONCLUSION

For the foregoing reasons, the court will deny CCN's application for entry of default, Doc. 19, grant DHS's motion to dismiss for failure to state a claim, Doc. 23, and grant in part and deny in part the Coalition's motion to dismiss for failure to state a claim, Doc. 29.  An order follows.

<div style="margin-left: 45%;">

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

</div>

Dated: July 23, 2026